Jorge **RIVADENEIRA**, Plaintiff,

v.

**SKIBS A/S Snefonn, Skips A/S Bergehus, and Sig. Bergensen D. Y. & Co.,** Defendants.

No. 68 Civ. 2919.

United States District Court, S. D. New York.

Jan. 5, 1973.

---

Paul C. Matthews, New York City, for plaintiff.

Haight, Gardner, Poor & Havens, New York City by David P. H. Watson, New York City, of counsel, for defendants.

## OPINION

GRIESA, District Judge.

This is a personal injury action by a seaman seeking damages under the Jones Act, 46 U.S.C. § 688, and under the general maritime law doctrine of unseaworthiness. Plaintiff also claims maintenance and cure. Defendant shipowners assert that Norwegian law applies, and that defendants have fulfilled their entire obligations under that law, precluding any recovery by plaintiff in this action.

The action was tried by the Court without a jury. The following decision constitutes the Court's findings of fact and conclusions of law.

Plaintiff is a citizen of Ecuador. He was born in that country in 1935. Some years ago (the precise time is not specified) he started going to sea, and at times served on Norwegian flag vessels. Despite his itinerant employment his residence continued to be in Ecuador. However, in 1966 his mother died, and plaintiff decided he would try to move to the United States. At this time he took a job as a seaman on a Swedish ship engaged in the banana trade between Central America and the United States. In connection with this employment he became a member of the Swedish Seaman's Union. The Swedish ship would make calls in the Port of New York and in California. While in New York he met, and became engaged to, a girl who was a permanent resident of the United States, although a citizen of a foreign country. During the time of his employment on the banana vessel, plaintiff did not establish a residence in the United States. When the ship called in New York, he would stay on the ship, or at the home of a cousin, or at the home of his fiancee.

On August 21, 1967 he signed off the Swedish banana vessel after nine months employment. He took a vacation from work and stayed with his cousin in New York City. At the time he left the Swedish vessel, he was given a card by the United States Immigration Service imposing a 29-day limit for his stay in the United States.

About two weeks after leaving the Swedish ship, plaintiff started going to the Scandanavian Shipping Office in New York seeking employment on a ship which would take him out of the country, so that he could comply with the Immigration Service deadline.

On September 20, 1967 plaintiff was hired to serve as an able seaman on board the M/T BERGEBOSS. The BERGEBOSS is a Norwegian flag vessel, owned by defendants, who are Norwegian corporations having their principal offices and places of business in Norway and having no offices in the United States. The BERGEBOSS is a tanker, and was on a time charter to a company called Pannac Limited of Nassau, Bahamas. The charterers, rather than defendant shipowners, had exclusive control over the itinerary and carryings of the BERGEBOSS. The BERGEBOSS was employed during the year 1967 in carrying oil from Venezuela to Portland,

Maine. From May 1967 through March 1968 the BERGEBOSS made 19 round-trip voyages between Venezuelan ports and Portland.

At the time plaintiff was hired for the BERGEBOSS, plaintiff gave the Scandanavian Shipping Office an address in Ecuador as his home address. In connection with his employment he was taken from the Scandanavian Shipping Office to the Royal Norwegian Consulate in New York City, where he signed shipping articles. The different parts of the articles were in the Norwegian language with English translations. One provision of the articles was as follows:

"The Master of the ship named in column No. 14 and the seaman named in column No. 2 have entered into following agreement about service onboard the said ship with the duties and rights stipulated in Norwegian legislation."

Plaintiff could read and speak some English, but claims that he did not read the provisions of this contract.

On September 24, 1967 plaintiff joined the BERGEBOSS in Portland, Maine. Plaintiff made one round trip on the vessel from Portland to Venezuela and back from September 25 to October 12. On October 15 the vessel left Portland again for Venezuela. In the early morning of October 17, plaintiff injured his left hand. Plaintiff was opening a metal hatch cover and was trying to insert a pin to keep the cover open, so that a tank cleaning machine could be inserted. While plaintiff was attempting to secure the pin the ship rolled and the cover fell on plaintiff's left hand. There was a fracture of the third and fourth metacarpal bones, which are the bones in the main part of the hand connecting the wrist with the fingers. There is no evidence as to the exact location of the ship at the time of the accident. It can be assumed that the ship was on the high seas, not in the territorial waters of the United States or any other country.

Plaintiff claims that the accident was occasioned by the negligence of the supervisory personnel of the ship and by the unseaworthiness of the vessel. He claims that he was made to work extra hours at night with inadequate supervision, assistance and equipment.

It is neither necessary nor appropriate to make findings of fact or conclusions of law on the questions raised by plaintiff's claims of negligence and unseaworthiness, since I hold that Norwegian law applies and plaintiff's claims for damages are precluded by that law.

At the time of the events in this case, the rights of an injured seaman under Norwegian law were governed by the Norwegian Seaman's Act of 1953, the Norwegian Health Insurance Act of 1956, and the Norwegian Occupational Injuries Insurance Act of 1958. Under Section 28 of the Seaman's Act an injured seaman who was not a Norwegian subject or resident was entitled to payment of wages to a maximum of one month following his departure from the vessel. He was also entitled to medical care and subsistence at the shipowner's expense for a period of six weeks after his departure from the vessel. If the seaman did not recover during the six-week period, he was entitled to further "benefit" under Section 11(1) of the Occupational Injuries Insurance Act, such benefit to be provided by the Norwegian National Insurance Institution. This benefit was available for a period not exceeding 52 weeks and was to be "in conformity with the provisions of the Health Insurance Act."

An expert witness on Norwegian law testified that under the provisions of the Health Insurance Act, as incorporated by reference in the Occupational Act, an injured seaman was entitled, after the expiration of the six-week period referred to above, to a continuation of medical care and subsistence. There was some confusion about what specific provision in the Health Insurance Act was referred to in the Occupational Injuries Insurance Act. However, Section 31 of the Health Insurance Act provided for medical care and board and lodging dur-

ing necessary absence from the place of domicile.

A seaman who was permanently disabled, where his capacity for work was reduced by 15% or more, was entitled to receive an annual pension from the National Insurance Institution based upon a percentage of the income earned at the time of the injury. Occupational Injuries Insurance Act § 12(1). Under Section 42 of the latter statute, a shipowner was not liable to pay any compensation or damages to an injured seaman (other than the sick wages, medical care, and subsistence provided for in Section 28 of the Seaman's Act) unless the shipowner had been found criminally liable for causing the injury intentionally or by gross negligence.

Following the accident, plaintiff was at sea on the BERGEBOSS for another four days. The ship then arrived in Maracaibo, Venezuela. Plaintiff left the ship on October 21, 1967 and was hospitalized in Maracaibo from October 21 to November 7. Surgery was performed and the fractures were set. On November 14 plaintiff was transported to New York. Plaintiff was offered repatriation to Ecuador but refused. He was then given treatment for his hand in New York by a physician selected and paid for by defendants. In addition, plaintiff consulted with an orthopedic surgeon at his own expense commencing December 19, 1967. The charges of this surgeon were $75.

Defendants paid plaintiff wages for one month after he left the ship. From November 14 through November 29, 1967 plaintiff stayed at the Swedish Seaman's Center in Brooklyn. The bill for his room and board was paid by defendants. Plaintiff left the Swedish Seamen's Center on November 29 and was married three days later—on December 2, 1967. The December 2 date coincides with the expiration of six weeks following plaintiff's departure from the ship. Plaintiff and his wife took up residence in a furnished room on Flatbush Avenue in Brooklyn. Since his recovery from the shipboard injury was not yet complete, he was still entitled to further medical care and subsistence. These were provided, and although the record is not specific as to who it was that provided these benefits, it can be assumed that it was the Norwegian Insurance Institution, pursuant to the Occupational Injuries Insurance Act. Plaintiff received $4.00 per day subsistence after leaving the Seamen's Center. These payments, plus the wages of his wife as a hospital employee, were apparently inadequate for the furnished room. After five weeks plaintiff and his wife went to live with plaintiff's cousin, to whom he paid the $4.00 per day.

Plaintiff was declared fit for duty on May 21, 1968. He was paid the $4.00 per day until that time. He did not return to sea. Instead, he took up work commencing May 28, 1968 as an instructor in arts and crafts.

Plaintiff has resided in the United States since his return here on November 14, 1967 following the injury. Plaintiff is still a citizen of Ecuador and has an Ecuadorian passport. In November 1967 plaintiff was given a 29-day permit to stay in the United States. That permit apparently has been extended. At some point plaintiff applied for permission to reside permanently in the United States. Action on this application has not yet been taken.

On the question of whether this case is governed by American or Norwegian law, the authority most closely in point is Tjonaman v. A/S Glittre, 340 F.2d 290 (2d Cir. 1965), which applied the leading Supreme Court decision, Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), to facts strikingly similar to those in the present case. In *Tjonaman* a Dutch national sued under the Jones Act and the general maritime law of the United States. He had become a legal resident-alien in the United States 29 days before becoming employed on a Norwegian owned and registered vessel. He was a member of the Norwegian Seamen's Union and obtained his position through that organization and

the Scandanavian Shipping Office. He signed the standard form of Norwegian shipping articles in the office of the Norwegian Consulate General in New York. These articles provided that the seaman's rights and duties would be those "stipulated in Norwegian legislation." The seaman was injured on board the vessel while it was in Ghanian waters. The Court in *Tjonaman* relied on the *Lauritzen* decision to the effect that "cardinal importance" is given to the law of the flag, and that such law "must prevail unless some heavy counterweight appears." 340 F.2d at 291. The Court in *Tjonaman* held that Norwegian law should apply and that the fact that the libelant was an alien resident of the United States was not sufficient to justify application of American law instead of the law of the flag.

The *Tjonaman* decision would dictate the application of Norwegian, rather than American, law in the present case. See also Frangiskatos v. Konkar Maritime Enterprises, S. A., 471 F.2d 714 (2d Cir. 1972). In fact, the libelant in *Tjonaman* had a somewhat stronger tie to the United States at the time of the injury than that shown by plaintiff in the present case. In *Tjonaman* the libelant had become a legal resident-alien. Plaintiff here had attained no status as a legal resident, and listed his home as Ecuador.

Plaintiff contends, however, that the *Lauritzen* decision and cases which follow it, such as *Tjonaman,* are no longer controlling; and that the Supreme Court has recently modified the *Lauritzen* doctrine in Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Plaintiff urges that under *Rhoditis* the law of the flag is not to be given the high order of importance accorded such law in *Lauritzen.*

It is true that in *Rhoditis* the law of the flag (Greek) was disregarded, and American law applied. But this was because the majority of the Court considered the Greek flag to be a "facade." The vessel was managed by a company which, although a Greek corporation, had its largest office in New York City and another office in New Orleans. More than 95% of the stock of this corporation was owned by a Greek citizen who was a United States domiciliary. This holding cannot really be construed as a departure from *Lauritzen.* Indeed the *Lauritzen* decision expressly recognized that in some circumstances it is proper to press "beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them." 345 U.S. at 587, 73 S.Ct. at 931.

Plaintiff points to the fact that the majority opinion in *Rhoditis* cited with approval the opinion of Judge Medina in Bartholomew v. Universe Tankships, Inc., 263 F.2d 437 (2d Cir. 1959), and that the latter opinion would appear to downgrade somewhat the importance of the law of the flag (see 263 F.2d at 441, 443). But the language of *Bartholomew* must be read in the context of the facts presented,—a Liberian flag vessel, which was ultimately owned by United States citizens, who directed the operations of the vessel out of New York City. In any event, there is nothing in the *Rhoditis* opinion which comes close to an announcement that *Lauritzen* has been overruled or modified.

■ Plaintiff has advanced the claim is this case that Norwegian law is discriminatory against non-Norwegians serving on the vessels of that nation, and is otherwise so repugnant to the laws and policy of the United States that it should not be enforced by our courts.

The claim of discrimination rests on the fact that Section 28 of the Seamen's Act granted Norwegian citizens and residents medical care and subsistence for twelve weeks, whereas non-Norwegians were granted such benefits for only six weeks. Also, Section 28 provided for the payment of two months sick wages to Norwegian citizens or residents whereas a non-Norwegian was entitled to receive sick wages for only one month. There were certain other differences with respect to repatriation rights, treatment

of special diseases such as tuberculosis, etc.

The first answer to the claim of discrimination is that certain of the differences in treatment disappear when the supplemental benefits provided under the Occupational Injuries Insurance Act are taken into account. For instance, although Section 28 of the Seamen's Act provided for medical care and subsistence to a non-Norwegian for only six weeks, the term for this care was extended under the Occupational Injuries Insurance Act, so that the non-Norwegian would receive care for the same total length of time as would the Norwegian citizen or resident. Also, if a non-Norwegian had no right of repatriation under Section 28 of the Seamen's Act, such a benefit was clearly granted by Section 31(12) of the Health Insurance Act, incorporated by reference in Section 11(1) of the Occupational Injuries Insurance Act.

█ Any remaining distinctions between the treatment of Norwegians and non-Norwegians would appear to be reasonable and are not grounds for a United States Court refusing to apply Norwegian law.

Plaintiff also argues that the total of the benefits and compensation afforded to an injured seaman under Norwegian law is so inadequate, as compared to the damages available under the Jones Act and under the unseaworthiness doctrine, that a United States court should refrain from giving Norwegian law recognition. This argument must be rejected. Norwegian law provides what is basically a workmen's compensation type of remedy. Clearly such a remedy is not repugnant to the laws or policy of this country. See Lauritzen v. Larsen, 345 U.S. 571, 575, 73 S.Ct. 921, 97 L.Ed. 1254.

It is therefore held that Norwegian law, rather than American law, applies with respect to plaintiff's injury. The only obligations which defendants had to plaintiff under Norwegian law were to provide one month's sick wages, and medical care and subsistence for six weeks. These obligations were fulfilled.

It has been stipulated that the limited tort remedy available against a shipowner under Section 42(1) of the Occupational Injuries Insurance Act gives no cause of action to plaintiff under the circumstances of this case.

Plaintiff claims that following his departure from the Swedish Seamen's Center, he was only paid $4.00 per day, whereas he was entitled to maintenance and cure at the rate of $8.00 per day. However, the subsistence paid him at that time (which was after the expiration of six weeks from the date of his departure from the vessel) was the obligation of the National Insurance Institution of Norway, not the obligation of defendants. Plaintiff has made no claim to the National Insurance Institution for additional subsistence.[1] Clearly defendants are not liable for any such additional subsistence.

For the foregoing reasons plaintiff has no cause of action against defendants. The complaint herein is dismissed.

---

1. Plaintiff has expressly disclaimed any argument that the procedures for making   claims under Norwegian law are too difficult or burdensome.