Isidoros MATTES, Plaintiff,

v.

NATIONAL HELLENIC AMERICAN LINE, S. A., et al., Defendants.

No. 74 Civ. 4653.

United States District Court, S. D. New York.

Jan. 24, 1977.

Thomas M. Breen, New York City, for plaintiff.

Poles, Tublin, Patestides & Stratakis, New York City, for defendants; Christ Stratakis, Alan Van Praag, New York City, Gregory J. Ligelis, Valley Stream, of counsel.

LASKER, District Judge.

Mattes is a Greek citizen, and was hired in Greece in 1972 under Greek articles of employment as a crew member of the S.S. AMERIKANIS, a Greek flag ship. On September 6, 1974 he allegedly suffered an injury on the vessel while it was in international waters on its way to New York. He sues to recover for maintenance and cure, wages and damages compensating him for his injuries.

Defendants have moved to dismiss or, in the alternative, for summary judgment on several grounds: that defendants Costa Line and National Hellenic American Line, S.A., did not employ plaintiff nor did they own or operate the vessel; that no basis exists for application of the Jones Act to the case, because there were insufficient contacts with this forum; that the claims for relief on the general maritime law must be dismissed because there is no diversity of citizenship; that this suit should be dismissed on forum non conveniens grounds; and that service on the defendants was improper.

## I.   Application of the Jones Act

The defendants vigorously urge that American law, particularly the Jones Act, cannot be applied to this case because there are not "substantial contacts" between the events in question and the United States, and rely primarily on *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The *Lauritzen* court held the Jones Act inapplicable to a suit against a Danish owner of a Danish flag ship brought by a Danish seaman injured in Cuban territorial waters, who, on being hired while temporarily in New York, had signed articles by which he agreed that his rights were to be determined by Danish law and in Danish courts. The court held that principles of international law should govern the decisions whether to apply American law in suits by foreign seamen under the Jones Act, and required dismissal of the claim. In particular, it noted the absence of any national interest in the foreign seaman's safety, particularly where the seaman was covered by a comprehensive statutory scheme in Denmark which was markedly inconsistent with American principles of recovery. Reasoning that "any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction," 345 U.S. at 582, 73 S.Ct. at 928, the court explicitly rejected the argument that "petitioner's commerce and contacts with the

ports of the United States are frequent and regular, as the basis for applying our statutes to incidents aboard his ships:"

> "the virtue and utility of sea-borne commerce lies in its frequent and important contacts with more than one country. If, to serve some immediate interest, the courts of each were to exploit every such contact to the limit of its power, it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea." 345 U.S. at 581, 73 S.Ct. at 928.

This rationale lay the basis for the requirement that jurisdiction be founded on "substantial" rather than simply "minimal" contacts between the "shipping transaction regulated and the national interest served by the assertion of authority." 345 U.S. at 582, 73 S.Ct. at 928.

As a guide to the lower courts, *Lauritzen* set forth seven possible "contacts" to be evaluated in deciding whether the Jones Act should be applied to an otherwise well-founded cause of action: (1) the place of the wrongful act; (2) the law of the flag of the vessel; (3) the allegiance or domicile of the injured; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the inaccessibility of a foreign forum; (7) the law of the forum. The court expressly held not to be a relevant consideration the competitive position of the foreign shipowner vis-a-vis American shipowners. 354 U.S. at 393, 73 S.Ct. 921.

The defendant Chandris American Line S.A. (of Monrovia) (hereinafter referred to as "CALSA") which concedes that it employed the plaintiff and owned the vessel AMERIKANIS, is organized under the laws of Liberia. The vessel is registered in Greece and flies under a Greek flag. As stated earlier, plaintiff is a Greek citizen and domiciliary, hired in Piraeus, Greece, by the Master of the AMERIKANIS. He signed Greek articles of employment in which he agreed to bring any claims exclusively in Greek courts and to be bound by Greek law. His injury occurred while the ship was in international waters a few hours sail from its New York City destination. He received medical treatment at St. Clare's Hospital, to which he was admitted on September 7th and from which he was discharged on September 14, 1974. Subsequently he returned to Greece and retired from seaman's work, allegedly because of the injuries for which compensation is sought. The Greek forum is accessible: CALSA has agreed to post bond to guarantee its appearance in a Greek court, should plaintiff sue there. (Defendants' Ex. 8) Defendants have also submitted an affidavit from a Greek attorney establishing that plaintiff will have a remedy in a Greek court, although it is unclear how that remedy compares to relief available under American law. (Defendants' Ex. 5)

Were *Lauritzen* our only guide, defendants' motion to dismiss for lack of substantial contacts would be granted. *See Tjonaman v. A/S Glittre*, 340 F.2d 290 (2d Cir. 1965); *Moutzouris v. Nat'l Shipping & Trading Corp.*, 196 F.Supp. 482 (S.D.N.Y. 1960); *Mpampouros v. Steamship Auromar*, 203 F.Supp. 944 (D.Md.1962). The fact that plaintiff received initial medical treatment in the United States is simply not sufficiently "substantial" to justify application of American law. *See Brillis v. Chandris (USA) Line*, 215 F.Supp. 520 (S.D.N.Y. 1963). However, in *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the court held that the *Lauritzen* list was not an exclusive one; at least one additional factor to be considered was the shipowner's "base of operations," whatever its formal allegiance might be. *Id.* at 309, 90 S.Ct. 1731, citing with approval, *Pavlou v. Ocean Traders Marine Corp.*, 211 F.Supp. 320 (S.D.N.Y.1962).

The *Rhoditis* court sustained Jones Act jurisdiction in a suit brought by a Greek seaman, employed in Greece under Greek articles which provided that all claims would be brought in Greece and decided under Greek law, who was injured on a Greek flag ship while in American territorial waters. The vessel was owned by a Greek corporation, a 95% shareholder of which was a Greek citizen domiciled in New York. The corporation's largest office was

in New York, the vessel was operated out of the New York office, and derived its entire income from cargo either terminating or originating in the United States. 398 U.S. at 308, 90 S.Ct. 1731. Although only one of the *Lauritzen* factors (place of injury) favored application of American, rather than Greek, law the court held that the alien owner's "substantial and continuing contacts . . . with this country" warranted application of American law, notwithstanding the foreign flag, plaintiff's nationality or his own agreement to sue only in Greece. 398 U.S. at 310, 90 S.Ct. at 1734. Adopting a different emphasis from that of *Lauritzen,* the *Rhoditis* court did not discuss the significance of the American locus of the injury, but did consider significant the desirability of achieving competitive equilibrium between foreign and American shippers when both operate in an American market.

The *Hellenic Hero* was not a casual visitor; rather it and many of its sister ships were earning income from cargo originating or terminating here. We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act "employer." The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country. 398 U.S. at 310, 90 S.Ct. at 1734.

It is under the *Rhoditis* doctrine and its progeny that plaintiff seeks to establish the applicability of the Jones Act to this suit.

In the two most recent Second Circuit decisions involving Jones Act claims by foreign seamen against foreign shipowners, district court determinations that the Jones Act was not applicable were reversed. In *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470 (2d Cir.) *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974), the foreign seaman was injured in Brazil aboard a foreign-owned, foreign flag ship. The district court dismissed the Jones Act claims, for lack of substantial American contacts, and tried the remaining maritime claims without a jury. The court of appeals reversed, holding on the basis of *Bartholemew v. Universe Tankships, Inc.,* 263 F.2d 437 (2d Cir.) *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959), that the fact that the shipowning corporation was wholly owned by American stockholders was alone a sufficient contact. In *Antypas v. Cia Maritima San Basilio, S.A.,* 541 F.2d 307 (2d Cir. 1976) a Greek seaman was injured on a foreign flag vessel while it was on the high seas between Hamburg and the Far East. The district court decision dismissing the complaint was reversed, in part because the Court of Appeals found that the managing agent of the vessel was, in effect, a New York corporation owned by American citizens and/or residents with close ties to the owning corporation.

Both cases indicate that a foreign seaman, injured on the high seas in a foreign flag ship owned by foreign interests may sue under the Jones Act, if the vessel has substantial American business contacts. Defendants argue, however, that the key factor in each of those cases was American stockownership. We disagree. Neither decision chose to rest on that point, although each indicated that American ownership alone required application of the Jones Act. The *Moncada* court indicated that (1) the base of operations; (2) the location of the managing or chartering agents; (3) the nationality of the corporate officers; and (4) the percentage of the vessel's voyages beginning or ending in American ports, were also significant. The *Antypas* court expanded this list, to indicate that (5) the extent to which advertising or other commercial transactions suggest an identity of interests between foreign owners and American agents; and (6) the place where the vessel's earnings were collected, and its expenses paid, must also be considered in

deciding whether the sum of the American contacts is substantial. Looking at these and similar factors as they emerge in the present case, there appear to be sufficiently substantial American contacts to require application of the Jones Act.

██ During the time in question the AMERIKANIS was a passenger vessel, most of whose voyages either originated or terminated in the United States. As Plaintiff's Exhibit 9 shows, between July 1, 1973 and June 30, 1975, the vessel came to New York 17 times, to San Juan, Puerto Rico 5 times, and to St. Thomas 4 times. Cf. *Moncada v. Lemuria Shipping Corp., supra* (40% of voyages to or from American ports considered significant); *Antypas v. Cia Maritima San Basilio, supra* (most voyages to or from U.S. ports). Although most crew members of the AMERIKANIS in the summer of 1974 were Greek, Bangladesh or other foreign nationalities, two Americans served as crew and numerous crew members signed on to the vessel at various times in American ports. (Defendants' Ex. 13) Eighty-five percent of its passengers were American citizens (Deposition of Joseph G. Bulous, at 8) and the vessel therefore derived the better part of its substantial revenues from these American customers. (See Plaintiff's Ex. 7; Deposition of Vasilios Kapetanakos, at 34). Cf. *National Hellenic Lines v. Rhoditis, supra* (all income from cargo going to or coming from U.S.). It is thus fair to say that the vessel itself had "continuing and substantial business" contacts with the United States, was no "casual visitor" to our shores, and was in competition with American passenger lines for their natural clientele.

Whether these factors alone create "substantial contacts" sufficient to justify application of the Jones Act need not be determined, since the vessel and its corporate owner had numerous other ongoing American business connections. Cf. *Brillis v. Chandris (U.S.A.) Inc., supra,* 215 F.Supp. 520.[1] The management and operation of the vessel, though divided among many countries and many corporations whose precise interrelationship cannot be determined on the present skimpy record, were centered in part in New York. CALSA, the self-acknowledged owner of AMERIKANIS, argues that the vessel's "base of operations" was in Piraeus, Greece, where CALSA's "general agent", OKEANIA, S.A. (another Liberian corporation) had its main office and controlled "all matters concerning the operation and management of the S.S. AMERIKANIS." (Affidavit of D. S. Sarandis, Treasurer and Director of CALSA, Defendants' Ex. 8; Affidavit of V. Kapetanakos, Defendants' Ex. 9).

Yet the evidence is not clear on the degree of control and supervision in fact exercised by OKEANIA. For example, although the defendants maintain that OKEANIA set the vessel's schedule and was responsible for arranging for repairs and overhauls, Joseph Bulous (an officer of the defendant Costa Line, Inc.) testified that the vessel's schedule was made up by yet another corporation, Chandris (London) in consultation with one of the defendants, Costa Line, Inc., an American corporation. (Deposition of J. Bulous at 46) It seems uncontested, though, that most of the crew was hired in Greece, that OKEANIA paid the crew's wages, and that many other expenses of the vessel were paid by OKEANIA.

Be that as it may, at least two American corporations played a significant role in the management of the vessel's affairs. Costa Lines, Inc., a named defendant, is a New York corporation with offices on Park Avenue. In 1972 it entered into a contract with the former owner of the AMERIKANIS (Chandris American Line S.A. (Piraeus))

1. In *Brillis,* Judge Dawson dismissed a Jones Act suit by a Greek seaman against a different "Chandris" corporation which, at the time, performed minimal husbanding agent duties for the ultimate owners of the vessel, and had only three employees in this country. 215 F.Supp. at 523. As will become apparent, the Chandris presence in this country has expanded greatly since 1962; for instance, Chandris America Lines, Inc., the AMERIKANIS' husbanding agent, has over 20 employees in this country and shares offices with other, related Chandris corporations. (Deposition of Vasilios Kapetanakos, at 24).

and its present owner, CALSA (Chandris American Line S.A. (Monrovia)) to "act as general passenger and marketing agent for AMERIKANIS in respect of [all] cruises commencing on and after 10th November, 1972." (Defendants' Ex. 12) Costa collects all passenger revenues for the AMERIKANIS, maintains a bank account for the ship at First National Citibank, and pays at least some of the ship's expenses from this account. It has substantial discretion over booking procedures, passenger reservations, accounting methods for keeping track of revenues, and over the preparation of advertising materials. Under the agreement, all substantial advertising and promotional materials, though prepared by Costa, must be submitted to Chandris (Eng.) Ltd. (not a signatory to the agreement) for its approval as an agent for CALSA.

In addition to Costa Lines, Inc., which acted as General Passenger Agent for the AMERIKANIS, Chandris America Lines, Inc., is a Delaware corporation with New York offices which, through November, 1974 were located at 17 Battery Place and since then at 666 Fifth Avenue, both in New York City. Vasilios Kapetanakos, the Secretary-Treasurer of Chandris, Inc., testified at deposition that he had previously worked for Chandris America Lines, Inc.; that both Chandris, Inc. and Chandris America Lines, Inc. (hereinafter referred to simply as "Chandris") are incorporated in Delaware and licensed to do business in New York; and throughout the relevant period (that is, commencing in 1974) one or the other acted as port and husbanding agent for the vessel AMERIKANIS. Mail for the ship's crew was sent to the Chandris offices at Battery Place, or to the Fifth Avenue office. Chandris of New York collected all port agent fees for the AMERIKANIS and deposited these monies in accounts at either First National Citibank or Atlantic Bank, in New York. Chandris made disbursements from these accounts for the provisioning of the vessel, for crew repatriation expenses and other port expenses, and paid for Mattes' hospital bill from St. Clare's Hospital. After making payment on behalf of the vessel, Chandris

submitted its bill to CALSA, which turned the bill over to Costa Lines for payment to Chandris from the passenger revenues account of the AMERIKANIS.

In addition to these services for the AMERIKANIS, Chandris acted as a passenger agent for other vessels owned by various corporations in the "Chandris Group." (Kapetanakos Deposition at 16–25). At both Battery Place and on Fifth Avenue, it shared offices with other "Chandris" corporations. For example, Chandris (New York) Inc. at 17 Battery Place is listed in the Greek Shipping Directory as the New York office for the Ship AMERIKANIS (Plaintiff's Ex. 2), although Kapetanakos testified that Chandris (New York) dealt only with cargo operations. (Deposition, 28–32) Plaintiff's Exhibit 4, a copy of the passenger tickets apparently sold for voyages on the S.S. AMERIKANIS shows on its face the logo "Chandris America Lines," and on the back a list of "Principal Offices and Agencies" headed by the U.S. office, listed as "Chandris America Lines, Ltd., 17 Battery Place." At the bottom of this list is the legend "Offices and General Agents in all major cities throughout the world." The 666 Fifth Avenue offices are shared with "Chandris Cruises," which is listed as the New York agent for 11 vessels plaintiff claims are in the Chandris empire, as well as with "Chandris Lines." (Plaintiff's Ex. 2; Plaintiff's Ex. 3, a letter on office stationery from Vasilios Kapetanakos).

Extensive advertising, prepared by Costa Lines, appeared in this country for cruises on the S.S. AMERIKANIS in 1974–75. In this advertising, business was solicited through relatively indiscriminate use of the "Chandris" name. A sample advertisement is Plaintiff's Ex. 5, in which the only identifying names on the brochure are those of the vessel (AMERIKANIS); of the General Passenger Agents (Costa Lines, Inc.); and of "Chandris America Lines." There is no indication of which of many possible "Chandris America Line" corporations is involved: Chandris America Line, S.A. of Monrovia, the vessel's present owner (referred to in this opinion as "CALSA"); Chandris Ameri-

ca Line, S.A. of Piraeus, the vessel's former owner; Chandris (England), Ltd.; Chandris America Line, Inc. of New York, the vessel's husbanding agent; or other Chandris America Line corporations, such as those listed on the back of Plaintiff's Exhibit 5, a copy of a Chandris passenger ticket. See also Plaintiff's Ex. 11.

Plaintiff's Exhibit 12 is an advertisement for cruises on several ships of various registries, not including the AMERIKANIS, which commences with the following words, in thick, one-inch high print: "OCEANS AHEAD WITH CHANDRIS." The reader is invited to inquire further by sending in a form, marked with a large print "CHANDRIS" logo underneath which appear the following names: "Chandris Lines," and "Chandris Cruises."

There is other evidence that CALSA, Costa Lines and Chandris America Lines of New York are closely connected with each other, and with other "Chandris" corporations. Costa Line's business letterheads read as follows, from left to right: "[indist.] linea Costa Line, Inc. Chandris America Lines." (Defendants' Ex. 11a) Kapetanakos, an officer of the vessel's husbanding agent, testified that approximately 40 vessels were in the "Chandris" group; that each was owned by a separate corporation; and that behind these corporations were individual members of the Chandris family. His belief was that all members of the family were Greek citizens and residents, but he testified that both A. J. and D. J. Chandris came to New York on business. Defendants' response to interrogatories shows that the officers of the three defendants in this case included three American citizens. Two of these, Victor Jacobs and Gabriel Galef, were officers of both CALSA and Costa Line, Inc.; Jacobs is both a Director and Secretary of CALSA, and both

of these are Directors as well as Secretaries of Costa Lines.

The *Rhoditis* court commented that:

"if, as stated in *Bartholemew v. Universe Tankships, Inc.*, 263 F.2d 437 [2d Cir. 1959], the liberal purposes of the Jones Act are to be effectuated, the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States."

Guided by this statement, we conclude that: the AMERIKANIS' business probably centered in the United States in 1974; substantial aspects of its operation, management and marketing are directed by American corporations; these American corporations, though nominally separate and distinct corporate entities, all functioned as interrelated parts of a worldwide, "Chandris" corporate group; members of this group sought to derive advertising benefit in this country through the use of the general identifying corporate name of "Chandris;" and defendants CALSA and Costa Line participated in a coordinated effort to conduct a passenger shipping business through the AMERIKANIS in the United States. In so doing, they put themselves in direct competition with American companies for American passengers. On this record, we find that the defendants have sufficiently substantial contacts with the United States, under *Rhoditis, Antypas* and *Moncada* to warrant application of the Jones Act. Neither absence of any proven American stock ownership, nor the fact that the injury occurred on the high seas (albeit while the vessel was on its way to New York) remove this case from the sweep of *Rhoditis*, particularly in light of the AMERIKANIS' American sources of revenue. See *Gomez v. Karavias U.S.A. Inc.*, 401 F.Supp. 104 (S.D.N.Y.1975).[2]

---

**2.** In *Gomez v. Karavias (U.S.A.) Inc., supra*, 401 F.Supp. 104, Judge Griesa recently held the Jones Act applicable in a suit by a foreign seaman injured on a foreign flag vessel owned by a Liberia corporation, while the vessel was on the high seas proceeding from New York to Caribbean ports. The defendant ship-owning corporation was part of a "far flung operation ultimately controlled by Anastos Karavias and members of his family," Karavias being a Greek citizen and resident who occasionally visited an apartment, owned by one of his companies, in New York City. Judge Griesa found that the Karavias interests had "an important

We recognize that the issue is close.[3] Taking heed of the Second Circuit's admonition that the "substantiality [of contacts is] to be determined on an absolute scale

arm" in the United States, namely, Karavias (U.S.A.) Inc., which acted as the vessel's husbanding agent, supplied and manned the vessel, had paid plaintiff's hospital bill and was the mailing address for numerous other Karavias ships. A third corporation in the Karavias group, Thira Maritime Company Limited, which shared offices with Karavias (U.S.A.) Inc., had an American bank account in which monies from the charter hire of the vessel were deposited and used to pay off a mortgage on the vessel.

Defendants argue that since there is no American-held mortgage on the AMERIKANIS, and since the AMERIKANIS was manned in Greece by OKEANIA, *Gomez* is distinguishable. Their effort to distinguish the *Gomez* case from this one is unpersuasive. Karavias (U.S.A.) Inc. performed functions comparable to those performed for the AMERIKANIS and CALSA by Chandris America Lines, Inc. in New York; the *Gomez* opinion does not specify what the "manning" functions of the husbanding agent were, and since numerous crew members of the AMERIKANIS signed on in New York, Chandris America Lines may have performed even this function. The absence of either of these contacts, moreover, is more than compensated by the substantial business presence of a New York corporation (Costa Lines, Inc.) acting as the vessel's General Passenger and Marketing Agent; by the presence of numerous other "Chandris group" corporations; and by the fact that 85% of the AMERIKANIS' passengers were American. A comparison of these and other facts in *Gomez* and the instant case fully justifies the conclusion, to borrow from Judge Griesa's language, that

"When the realities of the [Chandris] shipping operation are examined, and when the various separate corporations are looked at in relation to each other, it is apparent that the [Chandris] operation is world-wide, and that an important part of this operation is based in the United States." 401 F.Supp. at 107.

3. Comp. *Dassigienis v. Cosmos Carriers & Trading Corp.*, 442 F.2d 1016 (2d Cir. 1971), aff'g 321 F.Supp. 1253 (S.D.N.Y.1970); *Frangiskatos v. Konkar Maritime Enterprises*, 471 F.2d 714 (2d Cir. 1972), aff'g, 353 F.Supp. 402 (S.D.N.Y.1972); *Rivadeneira v. Skibs* F.Supp. 1382 (S.D.N.Y.1973); *Rodriguez v. Orion Schiffahrts-Gesellschaft Reith & Co.*, 348 F.Supp. 777 (S.D.N.Y.1972); *Stamatakos v. Hunter Shipping Co.*, 1972 A.M.C. 1001 (E.D. Pa.1972).

In *Dassigienis, supra*, 442 F.2d 1016, the Court of Appeals affirmed the district court's grant of summary judgment to the defendants in part on the grounds that there was no subject matter jurisdiction under the Jones Act. The facts, which were stipulated by the parties, showed that the Greek plaintiff had signed on the foreign flag vessel under Greek articles of employment in Belgium, and was injured in international waters while the vessel was on a time charter to Chevron Transport Corp. Pursuant to the charter, the vessel called at New York where plaintiff received medical aid. The court specifically rejected the argument that the shipowning corporation was doing business in New York, through its shipping agent and the fact that it had a checking account. The American agent was owned primarily by Americans, and the ship had called at New York only once. In the instant case, the vessel called frequently at American ports; derived most of its revenues from a liner service between American and other ports; and admitted in its answer to doing business in New York through Costa Lines, Inc.

In *Frangiskatos, supra*, 471 F.2d 714, the foreign flag vessel was owned by a foreign corporation wholly owned by foreign shareholders. Plaintiff, a Greek citizen, was injured in international waters on a vessel which had never called at a United States port and derived no income from American sources; plaintiff was admitted as a lawful resident alien to this country two years after his injury. The foreign shipowning corporation did maintain a shipping office in New York which assisted in negotiating time charter agreements; and forwarded illness and accident reports for the vessel in question and other enterprises bearing the Konkar name, but had no connection with the vessel's cargo transactions. None of the shareholders of the shipowning corporation had any interest in the New York agent. These facts are distinguishable not only for reasons apparent from the discussion, *supra* at 8–18, but because of overlapping interests and control over CALSA, Chandris America Lines Inc. and Costa Lines. Defendants' answers to interrogatories indicates that the sole shareholder of National Hellenic America Lines and CALSA is the Evgenia Investment Co., Ltd. S.A.; this corporation is wholly owned by Evgenia Chandris Trust Reg. of Lichtenstein. The beneficiaries of this trust are "D. S. Sarandis and A. K. Chandris, Greek residents who have not resided in the United States in the last 10 years." A. J. Chandris and D. S. Sarandis are officers of National Hellenic Lines; D. S. Sarandis is one of four officers of CALSA; and two of the four officers of CALSA are American citizens who, as indicated above, are also officers of Costa Line, Inc. Mr. Kapetanakos testified that A. J. Chandris is Chairman of Chandris, Inc. (the present husbanding agent for the AMERIKANIS) and that he is in charge of the entire Chandris empire, and was in New York as recently as 1973. Deposition at 15–20.

In *Rivadeneire v. Skibs, supra*, 353 F.Supp. 1382, Judge Griesa found that Norwegian law applied where plaintiff, a citizen of Ecuador

and not by comparing or balancing the presence of certain contacts with the absence of others," *Moncada v. Lemuria Shipping Corp., supra,* 491 F.2d at 472, however, we cannot ignore the well-entrenched and apparently successful business presence of the vessel and its corporate superstructure in this country. The contacts here are far more than those minimal contacts which suffice for the exercise of longarm jurisdiction over the owner, and which might arise simply from an occasional call at American ports; and while American contacts cannot be said to "predominate" over those of Greece, they appear to be "substantial" within the ordinary meaning of the word.

■ This conclusion is consistent with the "liberal purposes" of the Jones Act, since there is a national interest here in assertion of American law. By establishing a negligence standard of liability for claims by seamen injured in the course of their employment, the Act not only affords protection to the seaman but, indirectly, to passengers whose well-being is entrusted to the vessel's crew. Where the vast majority of a vessel's passengers are consistently American citizens, this country has an interest in extending its law to protect the vessel's foreign crew from injuries which might in turn affect the safety of passengers; this is particularly so when the corporate structure which runs, and ultimately benefits from the vessel's extensive American business has a substantial business presence in this country and competes directly with American vessels which are bound by American law.

The plaintiff has asserted a cause of action under the Jones Act which is "well founded in law and in fact." *Lauritzen v. Larsen, supra,* 345 U.S. at 575, 73 S.Ct. at 924.

## II. Diversity Jurisdiction and the General Maritime Law

■ Defendants are correct that there is no jurisdiction under the diversity statute, 28 U.S.C. § 1332, over the claims asserted against National Hellenic Lines or CAL-SA, since they are foreign corporations sued by a foreign plaintiff. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 358, 380, 79 S.Ct. 468, 3 L.Ed.2d 368; *Montalet v. Murray,* 4 Cranch (8 U.S.) 46, 2 L.Ed. 545 (1807); *Dassigienis v. Cosmos Carriers & Trading Corp.,* 442 F.2d 1016 (2d Cir. 1971), *aff'g* 321 F.Supp. 1253 (S.D.N.Y. 1970). However, where general maritime claims arise out of the same transaction or incidents as a Jones Act claim, both may be tried to the jury even though there is no diversity. *Fitzgerald v. United States Lines, Co.,* 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); *Bartholomew v. Universe Tankships Corp., supra,* 263 F.2d at 443–47.

Accordingly, plaintiff is entitled to trial by jury of all his claims.

---

was injured on a foreign flag vessel owned by a foreign corporation with no offices or agents in the United States in international waters. The vessel traveled regularly between the United States and Venezuela. Plaintiff had signed articles agreeing to the application of Norwegian law, and was at the time of decision receiving regular benefits under the Norwegian social security system. Subsequent to being injured, plaintiff became a resident of the United States. In the instant case, CALSA has a substantial business presence in the United States, and plaintiff contends that he has received no benefits including maintenance.

Finally, in *Rodriguez, supra,* 348 F.Supp. 777 (S.D.N.Y.1972) Judge Weinfeld held the Jones Act inapplicable in a suit by a Spanish seaman against the foreign owners of a foreign flag ship, even though the accident occurred in American waters. There, however, the defendant shipowner had no agent or office in the United States; operated none of its vessels on a liner service to the United States (those calls which were made were made under charter); and had no officers, directors or shareholders who were American citizens or residents. Moreover, plaintiff was receiving benefits under German law.

In *Stamatakos,* on facts quite similar to those in the instant case, the district court, noting that the issue was exceedingly close, found the Jones Act inapplicable. This authority is entitled to less weight than that of a decision by a member judge of our own district. See *Gomez, supra,* 401 F.Supp. 104.

*III. Forum Non Conveniens*

The district court has no discretion under the doctrine of *forum non conveniens* to dismiss or transfer a Jones Act claim where the American contacts are sufficient to warrant application of American law. *Antypas v. Cia Maritima San Basilio, S.A., supra,* 541 F.2d 307; *Bartholomew v. Universe Tankship Corp., supra,* 263 F.2d at 443. Nevertheless defendants urge dismissal of the general maritime law claims on this ground because plaintiff and, it is claimed, all witnesses to the accident are foreign nationals who do not speak English and are not subject to process here. If there were no jurisdiction under the Jones Act, it might well be appropriate to exercise discretion to dismiss the case, subject to defendants' consent to the exercise of the jurisdiction of the Greek courts. Plaintiff's American medical records could easily be transferred to Greece, and considerations of the advisability of trying this case between a foreign plaintiff and foreign defendants in the terribly congested trial calendars of this district militate in favor of the transfer. See *Brillis v. Chandris (U.S.A.) Lines, supra,* 215 F.Supp. 520; *Hatzoglou v. Asturias Shipping Co., S.A.,* 193 F.Supp. 195, 196 (S.D.N.Y.1961). However, since the Jones Act claims must be tried in this court in any event, it would be wasteful of judicial resources to dismiss the general maritime claims. *Gomez v. Karavias (U.S.A.) Inc., supra,* 401 F.Supp. 104, at 107.

*IV. Relationship of Costa Lines and National Hellenic Lines to the Plaintiff*

A Jones Act claim lies only against the plaintiff's employer. *Dassigienis v. Cosmos Carriers & Traders, supra,* 442 F.2d 1016 (2d Cir. 1971); *Romero v. Garcia & Diaz, Inc.,* 286 F.2d 347, 351 (2d Cir. 1961). Both National Hellenic and Costa Line Inc. have moved to dismiss the Jones Act and general maritime claims on the ground that neither of them was plaintiff's employer, nor did either of them control or manage the vessel in such a way as to be responsible for any negligence or unseaworthiness which may have caused plaintiff's injury.

National Hellenic Lines' motion cannot be granted at this stage of the proceedings, since there is a factual dispute as to whether or not it owns or owned the AMERIKANIS at the time of the accident. Although defendants have submitted affidavits from an officer of National Hellenic, and of CALSA, swearing that National Hellenic does not own or operate the AMERIKANIS, and that CALSA does, plaintiff's attorney swears that Lloyd's Register of Ships lists National Hellenic as the owner of the vessel. Although counsel should submit to the court the documents on which he relies, this is a contested issue of fact which must be determined on competent evidence.

Although there is ample evidence that Costa Line performed numerous business functions for CALSA in connection with the vessel AMERIKANIS, it does not appear that Costa employed Mattes, was responsible for his hiring or firing, paid his wages or that an employer-employee relationship existed between them. Nor is there evidence that Costa Line had any control over or responsibility for the actual operation of the vessel (other than evidence of its consultative role in planning the vessel's schedule). Plaintiff urges that in light of the confused state of the record concerning ultimate ownership and control over the vessel, and the overlapping officers of CALSA and Costa Lines, the motion be denied at present. Unless the plaintiff within sixty days submits to the court specific facts which indicate that Costa Line could, under the Jones Act or the general maritime law, be held responsible for plaintiff's injuries, the claims against Costa Line will be dismissed.

*V. Service*

Plaintiff first attempted to serve National Hellenic Lines and CALSA by delivering the summons and complaint with its service on Costa Line, Inc., as a defendant. Joseph G. Bulous, an officer of Costa Line, directed plaintiff to serve CALSA and National Hellenic at the office of Chandris America Lines, Inc., at 17 Battery Place. The papers were then delivered to Chandris Amer-

ica Lines' offices in New York. Defendants National Hellenic and CALSA now move to dismiss the complaint against them on the grounds that they were never properly served.[4]

Even if service were found to be ineffective, the proper course would be only to quash service, permitting the plaintiff to attempt valid service. *Grammenos v. Lemos,* 457 F.2d 1067, 1071 (2d Cir. 1972). However, we agree with plaintiff that service was properly made on the foreign defendants as provided in Fed.R.Civ.Proc. 4(d)(3) which permits personal service on a domestic or foreign corporation through service on its "managing or general agent."

"[N]ormally, the person in charge of the activities in the state which are the basis for the conclusion that the defendant is present is the managing agent for purposes of service." *Grammenos v. Lemos, supra,* 457 F.2d at 1072. CALSA admitted to being present in New York State through Costa Lines, Inc., which acts as its General Passenger Agent. (¶ 46 of Defendants' Answer). That Costa's exercise of discretion over the preparation of promotional material is subject to approval by CALSA's agent, Chandris (Eng.), Ltd., does not detract from the fact, obvious from Costa's contract with CALSA and from its conceded designation as "general passenger agent," that "it is a person or entity authorized to transact all business of the principal at a particular place or of a particular kind . . . ." *Grammenos v. Lemos, supra,* at 1073. Accordingly, we find that the foreign defendants were properly served by service on their general agent, Costa Lines.

In addition, Chandris America Lines, Inc. of New York, which, it is conceded, acted as the vessel's husbanding agent in the United States, is also a "general or managing agent" of the shipowner. Unlike the American corporation upon whom service was made (and found ineffective as to

the foreign shipowner) in *Grammenos,* which was a mere "subagent" of the shipowner since its only direct commercial relationship was with the shipowner's general agent (i. e., equivalent to OKEANIA in this case), Chandris America Lines, Inc. of New York is the vessel's husbanding agent and has a direct and continuing agency relationship with CALSA. (See pp. 624–625, *supra*). This is sufficient for purposes of Rule 4(d)(3). See *Arpad Szabo v. Smedvig Tankrederi A.S.,* 95 F.Supp. 519, 521–22 (S.D.N.Y.1951); *Green v. Compania de Navigacion Isabella, Ltd.,* 26 F.R.D. 616 (S.D.N.Y.1960). Although at least one case has held that even a husbanding agent is not a general agent for purposes of Rule 4(d)(3), it is wholly distinguishable. In *Thyssen Steel Corp. v. Federal Commerce & Navigation Co.,* 274 F.Supp. 18 (S.D.N.Y.1967), service was effected on the "husbanding agent" for the S.S. World Mermaid. The court found that the service was ineffective on the foreign corporate owner of the vessel, because there was no showing that the vessel ever made regular stops in the United States; that it ever stopped in this district; or that the husbanding agent was performing any services for the vessel at the time service was made. The *Thyssen* record showed only that on five occasions in the past, the American corporation had served as husbanding agent for the vessel. In this case, it is beyond dispute that Chandris in New York has performed and continues to perform as the AMERIKANIS' husbanding agent. Moreover, it cannot be said that Chandris contracted with the owner only on a ship-to-ship basis, *Grammenos v. Lemos, supra,* at 1073, since there is evidence in the record to indicate that CALSA only owns the single vessel AMERIKANIS. (Deposition of Kapetanakos, at 41).

Accordingly, we find that service was properly effected on the defendant CALSA.[5]

---

4. Plaintiff has also attempted to serve National Hellenic and CALSA through the provisions of Rule 4(i) for service on defendants not found within the state, by mail requiring a return receipt. To date, no return has been received.

5. The defendants did not separately brief the adequacy of service on National Hellenic, which we have found must remain a party to this suit until the question of its possible ownership of the AMERIKANIS is established. Ac-

The defendants' motion to dismiss and for summary judgment is disposed of in accordance with the above memorandum.

It is so ordered.

cordingly, we make no ruling on the adequacy of the service effected on National Hellenic Lines.

In order to assure jurisdiction over all party defendants, plaintiff may still wish to apply for permission under Rule 4(e) to make alternate service on the foreign defendants.