Jack FISHER, etc., Plaintiff-Appellee,

v.

The AGIOS NICOLAOS V et al.,
Defendants-Appellants.

Eugenia KEPESSIDIS, Individually, etc.,
et al., Plaintiffs-Appellees,

v.

The AGIOS NICOLAOS V, etc., et al.,
Defendants-Appellants.

No. 79–1103.

United States Court of Appeals,
Fifth Circuit.

Jan. 28, 1981.

Robert S. DeLange, Galveston, Tex., E.
D. Vickery, Houston, Tex., for defendants-
appellants.

Paul H. Due, Baton Rouge, La., for Euge-
nia Kepessidis.

ON PETITION FOR REHEARING AND
PETITION FOR REHEARING
EN BANC

Before MORGAN, CHARLES CLARK
and TATE, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is DENIED
and the Court having been polled at the
request of one of the members of the Court
and a majority of the Circuit Judges who
are in regular active service not having
voted in favor of it, (Rule 35 Federal Rules
of Appellate Procedure; Local Fifth Circuit
Rule 16) the Petition for Rehearing En
Banc is DENIED.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge, with whom AINSWORTH, GEE, TJOFLAT, VANCE, GARZA, AND RANDALL, Circuit Judges, join dissenting:

I must dissent from the Court's refusal to rehear this case en banc. Left to stand, the opinion-decision opens the 19 District Courts of the six maritime states of this Circuit and, by precedent, all of the federal and state courts of the nation to injury/death claims by foreign crew members against their foreign flag employers for recovery under American statutory (Jones Act) or general maritime law. All that is required to trigger this new burden on beleaguered federal courts is the presence of the foreign flag vessel to pick up cargo on the ship's sole voyage to an American port. There need be no American direction, control or operation, nor the presence of foreign nationals as domiciliaries running things from an American base.

In more austere terms I believe that the panel's opinion is contrary to law of this Circuit and of the Supreme Court. I am particularly concerned with that portion of the panel's opinion concerning the choice of American law. The choice of law question is a significant one in and of itself, and, perhaps even more so, because as the panel concedes "law factors are relevant in the determination of a forum non conveniens issue."[1] *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 315 (5th Cir. 1980).

The significant facts of this case, for choice of law purposes, are not in dispute. The decedent was a citizen of Greece. *Id.* at 316. The vessel flies a Greek flag and is registered in Greece. *Id.* The two corporate defendants which own (Liberian) and operate (Panamanian) the vessel are themselves owned and operated by three brothers, all of whom are resident citizens of Greece. *Id.* at 311, n.1. The decedent signed his employment contract in Greece. *Id.* at 316. The only thing American is the fortuitous circumstance that the fatal injuries took place in Beaumont, Texas.

The only two factors which under *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) might suggest the application of American law are the fact that the accident occurred in American waters and that the forum chosen is American.[2] However, neither of these factors have been accorded particular weight in choice of law determinations.[3] The additional factor cited by the panel that the decedent joined the vessel in the United States has similarly been accorded little weight.[4]

There is no doubt that under a strict *Lauritzen* analysis, foreign law would apply. However, relying on *Hellenic Lines v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the panel supports the finding of the District Court that defendants had a substantial base of operations in the United States and, accordingly, that American law should apply. The panel's reliance on *Rhoditis* is misplaced, first, because I believe that some of the findings of

---

1. Without extended discussion I disagree also with the panel decision on forum non conveniens.

2. The panel did not pass on plaintiffs' argument as to the inaccessibility of Greece as a forum. 628 F.2d at 317, n.14, 15.

3. For insignificance of place of injury as a *Lauritzen* factor, see *Lauritzen*, 345 U.S. at 583, 73 S.Ct. at 928; *Koupetoris v. Konkar Intrepid Corp.*, 535 F.2d 1392, 1396 (2d Cir. 1976); *Mon-*

*cada v. Lemuria Shipping Corp.*, 491 F.2d 470, 472–73 (2d Cir. 1974). For insignificance of law of forum as a *Lauritzen* factor, see *Lauritzen*, 345 U.S. at 591–92, 73 S.Ct. at 932–933; *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026 (2d Cir. 1973).

4. Although the Plaintiff in *Lauritzen* joined the crew of the vessel in New York, the Court found this factor to be of little significance. 345 U.S. at 587, 73 S.Ct. at 930.

the panel with respect to defendants' purported "base of operations" in the United States simply have no support in the record, and second, and much more significant for purposes of en banc consideration, because I am convinced that the panel's opinion misinterprets the holding of *Rhoditis* and applies a legal standard contrary to the law of this Circuit.

As found by the panel, the vessel here had sailed on its maiden voyage under the ownership and operation of defendants to Beaumont, Texas to load a cargo of corn for delivery to the Soviet Union. 628 F.2d at 311. Although this was the first, and only, business venture of the vessel, under ownership of defendants, at a United States port prior to the time of the accident, the panel supports the District Court's conclusory finding that defendants had a substantial base of operations in the United States observing that

> the District Court primarily relied upon as a determinative factor that, prior to the accident, the vessel's entire service under its present ownership, and its entire revenues therefore to be earned, arose from a base of operations in the United States.

*Id.* at 317. While this may be true as a naked proposition, the same could be said for any vessel coming into a United States port on its maiden voyage for purposes of taking on cargo. And if that reasoning is valid here it would mean that every injury/death to a foreign seaman occurring in a United States port on the vessel's first voyage to this Country would invoke American law—Jones Act or General Maritime.

The panel goes on to state in a footnote that "[f]rom external manifestations as of the time of the accident, the vessel had been purchased primarily to service the American grain trade." *Id.*, n.16. The District Court made no such finding and I have been unable to uncover any evidence in the

record to support such a finding. This is a remarkable "finding" considering the minimum life expectancy of twenty years for a modern ship and that the mission for the vessel is to be determined by the nature of the first voyage and cargo. The only other factor relied upon by the panel to support its substantial base of operations finding [5] is the fact that the vessel in question was the only vessel owned by the defendant shipowner.

It is significant that neither the District Court nor the panel made any finding to the effect that defendant corporations or any individuals having anything to do with their direction and control had their principal—or indeed, any—place of business in the United States. Nor was there any finding that the expenses of the vessel were paid in the United States, or that the actual management of the vessel was from a United States office, or that any of the stockholders of the defendants were United States citizens or residents. Indeed, no finding was even made that defendants maintained any offices in the United States or were even affiliated with any organization that had offices or operations in the United States.

Although I am disturbed by what I feel to an unfounded conclusion of the panel that this vessel, at the time of the accident, had engaged in and/or contemplated substantial operations in United States ports, I am even more concerned by the legal implications of the panel's opinion. In spite of the panel's disclaimer that it "do[es] not, of course, intimate that doing *any* amount of business in a United States port, however minor, is alone sufficient to establish a 'substantial base of operations'" (*Id.* at 317, n.17), the clear purport of the panel's opinion is that a foreign defendant whose vessels regularly call at United States ports subjects itself to American law for the reso-

---

**5.** The panel also points out in note 18, 628 F.2d at 318, that plaintiffs rely in brief upon the purchase of the vessel having been financed through a United States bank branch. However, the panel does not appear to rely upon this contention, finding that the record is am-

biguous on this point. At any rate, the mere financing by American sources of a foreign vessel has been held of little significance in a *Rhoditis* analysis. *Zoriano Sanchez v. Caribbean Carriers Ltd.*, 552 F.2d 70, 73 (2d Cir. 1977).

lution of personal injury or death claims of the vessels' crew members occurring within American waters.

In fact, each of the cases cited by the panel in support of its holding emphasizes parenthetically the frequency of visitation to United States ports, or the substantial revenue earned from United States trade, as the distinguishing feature of the case. An examination of the cases cited by the panel, however, belies the notion that merely conducting business in United States ports is sufficient to establish a "substantial base of operations" for purposes of applying American law. None of the cases, which I review briefly here, involves contacts as insubstantial as those in this case.

While it is true, as emphasized by the panel, that in *Rhoditis* the Court found that the entire income of the vessel was from cargo either going to or coming from the United States, the Court also emphasized that the corporate defendant had its largest office in New York and another office in New Orleans, and that more than 95% of its stock was owned by an individual who, though a Greek citizen, was a United States domiciliary who managed the corporation out of New York. 398 U.S. at 307, 90 S.Ct. at 1733.

*Antypas v. Cia Maritima San Basilio, S. A.*, 541 F.2d 307 (2d Cir. 1976) did involve, as the panel states, a vessel most of whose voyages were to or from United States ports. However, the Court in determining American law to be appropriate in that case, also relied on the fact that at least some of the stockholders of the shipowner were American citizens, that the vessel was under the direct control of an American corporation which directed the vessel from its office in New York, and that the earnings and expenses of the vessel appeared to be collected and paid from New York. *Id.* at 310.

In *Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470 (2d Cir.); *cert. denied*, 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974) the Court did find that 40% of the vessel's voyages were either to or from American ports. However, the Court also found that

"of the contacts favoring the Plaintiff in the present case, the most important is that all of the stock of all of the defendants was owned by Americans." *Id.* at 473. The Court also found that all of the defendants had their base of operations in the United States and that the managing and chartering of the vessel was done from the United States. *Id.*

Finally, in *Mattes v. National Hellenic Am. Line, S. A.*, 427 F.Supp. 619 (S.D.N.Y. 1977), while true that the District Court found that most voyages of the vessel either originated or terminated in United States ports, the Court further found that at least two American corporations played a significant role in the management of the vessel's affairs. *Mattes* can be further distinguished from our case since the ship was a passenger vessel the vast majority of whose passengers were American citizens, and thus, the Court believed, there was an additional compelling national interest in applying American law. *Id.* at 628.

After making my own survey of Circuit Court cases concerning choice of law under the Jones Act and general maritime law I have found no case which has held that the mere fact that a vessel calls regularly at a United States port is sufficient to satisfy the "substantial base of operations test" of *Rhoditis*. In our own Circuit, it is clear that something more than frequent calls is required, as evidenced by three cases which the panel opinion failed even to cite but necessarily failed to follow.

In *Merren v. A/S Borgestad*, 519 F.2d 82, 83 (5th Cir. 1975), this Court, while not mentioning the frequency of visitation of the vessel to the United States, rejected the application of the base of operations test finding that

> defendants maintained no offices in the United States and were affiliated with no organization in the United States, except to the extent of having shipping agents who contracted in American ports for the use of the ship's services.

*Id.* at 83.

Similarly, in *Tamboris v. Kainis Compania Maritima, S. A.*, 439 F.2d 1131, 1132 (5th

Cir. 1971), while not discussing the frequency of visitation of the vessel to the United States, this Court rejected application of *Rhoditis* finding that unlike that case "it is here undisputed that no American citizens or residents own any share of the owning corporation, directly or indirectly."

More recent and more to point is an unpublished opinion of this Court affirming the District Court's rejecting the application of American law on facts strikingly similar to those in this case. *Avila v. M/V TOLUCA* (No. 79–2921, May 30, 1980). The memorandum and recommendation of the Magistrate, Norman Black, now United States District Judge, which was adopted in full by the District Court and which formed the basis for affirmance by this Court, specifically rejected Plaintiff's argument that the frequency of the vessel's visit to the United States established a substantial base of operations for purposes of *Rhoditis*. The memorandum opinion, set out in full as *Appendix*, found that:

> From a reading of the relevant cases . . . doing business in, or trading at, a United States port is not the same thing as establishing a base of operations in the United States as set forth in *Rhoditis*.[6]

Although nowhere expressed, the panel, oblivious to the existence of these three Fifth Circuit opinions, seems to operate on the dubious theory that this Court merely approved as not clearly erroneous the finding by the trial court that a substantial base of operations was established. Where legal standards are involved—as they must certainly be under *Lauritzen* and *Rhoditis* —they may not be ignored, overlooked or watered down by any such distortion of the function of F.R.Civ.P. 52(a).

The substantially identical facts in *Merren, Tamboris* and most particularly *Avila*, on the one hand and those in the instant case cannot justify the rejection of American law in those three while allowing it here. To conclude otherwise is to permit decision of this very significant question of law to be determined, not by principles, but by an unguided fact finding.

One need only look in the Yellow Pages to see the number of foreign shipping lines which regularly trade to and from United States ports in established liner service. I seriously doubt that when the Supreme Court handed down *Rhoditis*, it contemplated that, for example, a French cargo vessel, owned and operated by the French government, flying the French flag, carrying a French crew, and directed out of France, would be subject to the laws of the United States for the resolution of the personal injury claims of its crew members occurring in American ports, even if the vessel regularly called at United States ports and derived considerable revenue from this trade.

And yet this is the direct implication of the panel's opinion. While such a rule of law might seem to some to be desirable—I personally feel it is not—I believe that before the federal courts of this Country are opened significantly wider to the claims of every foreign seamen and their heirs for injury/death occurring in American waters, specific directions should come from Congress or at least from this Court sitting en banc or from decisive change in the applicable legal standard by the Supreme Court.

As a major maritime world power encouraging commerce to and from America by

---

**6.** This Court continues to face claims by foreign seamen based on tenuous grounds for the application of American law and, after the decision in this case, will undoubtedly face many more. For example, very recently in the case of *Nunez-Lozano v. Rederi*, 634 F.2d 135 (5th Cir. 1980) this Court was faced with the question of whether American law was appropriate in a case where a Honduran seaman was injured in Liberia while aboard a Norwegian vessel. Although he received Norwegian compensation, the seaman sought to invoke American law on the grounds that he joined the vessel and signed his seaman's contract in New Orleans and that he returned to New Orleans for treatment after the accident. Faced with insufficient contacts under *Lauritzen*, the seaman urged application of *Rhoditis* on grounds that "the existence of stockholders in 'companion corporations' proved that appellee's corporate citizenship is not 'exclusively Norwegian.'" Although the Court declined application of American law on these facts, one can only wonder if the Honduran seaman would have presented a different set of facts, and possibly prevailed, if the instant case had been decided at the time he first pressed his claim in District Court.

opening all ports to all vessels of all nations flying all flags, what does this decision portend? Does it mean that Congress or federal courts intended to open all American courts to the hundreds of thousands of seamen to receive and dispose of their claims for injury/death fortuitously occurring within our borders as their ships come here from time to time?[7] Is our renowned largesse for humanity to lead us not only to substitute our legislative or judicial concepts for those of their own countries, but to supplant the system and standards thought to be sufficient by their own countries?

The opinion offers no answer to these and other troubling questions save the simplistic one: Leave it to the fact finder—Judge or jury—

I must therefore dissent.

*Appendix*

The unpublished opinion of this Court in *Avila v. M/V Toluca* (No. 79–2921, May 30, 1980) reads as follows:

Before AINSWORTH, FAY and RANDALL, Circuit Judges.

PER CURIAM:

Affirmed on the basis of the district court's order and judgment dated July 10, 1979 adopting the Memorandum and Recommendation of the United States magistrate dated April 6, 1979.

AFFIRMED.

The following is the memorandum and recommendation of the United States Magistrate, also unpublished:

This action was filed by the father of Rafael Aguilar Avila, a Mexican seaman who lost his life while serving aboard Defendant's ship in the Port of Covington, Maryland, on May 5, 1975. Suit was brought under the Jones Act, 46 U.S.C. § 688, and the General Maritime Law of the United States. Defendant has filed a motion to dismiss for lack of subject matter jurisdiction, and alternatively for the doctrine of forum non convenience. Plaintiff requests that the Court deny the motion and grant a six-month period of additional discovery on the questions of jurisdiction and forum non convenience, or, in the alternative, to transfer the action to the United States District Court in Maryland.

Defendant alleges the following:

The contacts of Defendant with the United States are not substantial and are insufficient to invoke the Jones Act or the General Maritime Laws of the United States. The only contact that the United States has with this lawsuit is the drowning of Rafael Aguilar Avila in the Port of Covington, Maryland. Everything else is completely Mexican, including the following:

1. Plaintiff's descendant, Rafael Aguilar Avila, signed in Mexico an employment agreement governed by the law of Mexico for employment aboard the M/V TOLUCA II as a seaman.

2. Rafael Aguilar Avila was a Mexican citizen and resident at the time of employment and at the time of his death.

3. The Plaintiff herein, the father of Rafael Aguilar Avila, is a Mexican citizen and resident.

4. The vessel, M/V TOLUCA II, is of Mexican registration and wholly owned by Mexican citizens.

5. The Defendant herein, the employer of Plaintiff, Transportation Maritima Mexicana, S.A., is a Mexican corporation wholly owned by Mexican citizens. There is no United States beneficial ownership of any kind in Transportation Maritima Mexicana or the M/V TOLUCA II. This is not a "flag of convenience" case.

---

**7.** Even more disturbing is the unanswered question of whether federal courts are to be opened to claims of foreign seamen injured or killed in disparate spots throughout the globe on vessels which merely call at United States ports. As noted previously (see n.3, *supra*), place of injury is a factor of little weight in a strict *Lauritzen* analysis and clearly has no weight in a *Rhoditis* "base of operations" analysis. If the meager contacts of this case support the application of American law it is a very small step to apply American law in cases distinguishable from this case only by the legally insignificant, for maritime choice of law purposes, fact that the injury/death occurred outside of American waters.

6. All of the members of the crew of the vessel who could possibly be witnesses of any kind in this cause of action, are Mexican residents and Mexican citizens.

7. The deceased seaman, Rafael Aguilar Avila, and his employer are subject to Mexican law, and pursuant to such law, the mother of Rafael Aguilar Avila and his designated beneficiary, Maria Antonio Avila Alonso, executed a release on June 9, 1975, releasing Defendant, the TOLUCA II, and the captain and members of the crew of the vessel, in accordance with the laws of Mexico from any and all responsibility for his death in consideration of the sum of 80,000 pesos.

8. The headquarters and home offices of the Defendant are all located in Mexico. The affairs of the Defendant company were conducted from Mexico. The M/V TOLUCA II is operated by Defendant from Mexican offices and had no base of operations in the United States. There are no operating agents employed in the United States. The only agents employed by Defendant are temporary, husbanding agents who represent the vessel in a limited capacity only while the vessel is in a foreign port.

9. The M/V TOLUCA II is an ocean going cargo vessel and operates out of the ports of Mexico to various foreign ports of the world, some of which are in the United States.

Plaintiff generally responds as follows:

1. Thirty percent of Defendant's shipping business is done in and out of the ports of the United States.

2. Most of the voyages of the M/V TOLUCA II in the years 1974 and 1975 (the accident occurred in May, 1975), at least up until it was assigned to a permanent arrangement outside the United States' ports in August of 1975, were to and from the United States. Ninety-seven visits to American ports for the period 1973 through August 15, 1975, were counted.

## SUBJECT MATTER JURISDICTION

In *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 440–441 (2nd Cir.), *cert.* denied, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959), the Court held that the Jones Act jurisdiction exists only when there are substantial contacts between the transaction involved in the case and the United States, with substantiality determined on an absolute scale and not by comparing or balancing the presence of certain contacts with the absence of others. *Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470, 472 (2nd Cir. 1974). In determining whether the contacts are substantial the courts have given consideration to the significance attaching to specific contacts. *Id.* In *Lauritzen v. Larsen*, 345 U.S. 571, 583–590, 73 S.Ct. 921, 928–932, 97 L.Ed. 1254 (1953) [hereinafter referred to as *Lauritzen*], the Supreme Court enumerated the following contacts as worthy of consideration: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance of the Defendant shipowner; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum.

In *Hellenic Lines Limited v. Rhoditis*, 398 U.S. 306, 308–309, 90 S.Ct. 1731, 1733–34, 26 L.Ed.2d 252 (1970) [hereinafter referred to as *Rhoditis*], the Court held that this list is not exhaustive. It decided that the shipowners base of operations is also an important contact and "there well may be others."

Plaintiff is putting much emphasis on the fact that the tort occurred in the United States, where Defendant conducts thirty percent of its business (including 97 specific trips by the TOLUCA as discussed supra). Plaintiff cites many cases to support his position that the place of injury within the territorial waters of the United States is in itself sufficient to justify invoking jurisdiction under the Jones Act or General Maritime Law. *The Paula*, 91 F.2d 1001 (2nd Cir. 1937), *cert. denied sub nom. Peters v. Lauritzen*, 302 U.S. 750, 58 S.Ct. 270, 82 L.Ed. 580 (1937); *Hansen v. A. S. D. S. S. V. Endborg*, 155 F.Supp. 387 (S.D.N.Y. 1957); *Nakken v. Fearnley and Eger*, 137 F.Supp. 288 (S.D.N.Y.1955). Actually, all of

such cases hold to the contrary. They hold that injury in United States waters, alone is *insufficient* to support jurisdiction.

The case of *Bartholomew v. Universe Tankships, Inc., supra,* is also heavily relied on by the Plaintiff. In that case, the United States jurisdiction was upheld, but *not alone* on the ground that the injury occurred in the United States waters. It clearly appeared that the foreign flag on the vessel was a flag of convenience, the vessel was owned by United States citizens, and that its base of operation was New York City. Furthermore, Plaintiff had applied for United States citizenship. In the case at bar there was no contention that the TOLUCA was flying a flag of convenience, or that there was any United States ownership. The TOLUCA was wholly owned by Mexican citizens, and the Mexican Federal Government. It was operated from Mexico.

Plaintiff also places great reliance on the *Rhoditis* case and the base-of-operations factor. In *Rhoditis* the beneficial owner was a resident of the United States for eighteen years and conducted the affairs of the corporation from offices in the United States. The ship involved was employed exclusively in, and derived all of its income from, trade in the United States. Plaintiff, in attempting to place himself within the ambit of this decision, refers to the fact that the vessels of the Defendant did thirty percent of its business in United States ports (including 97 trips made by the M/V TOLUCA). From a reading of the relevant cases the undersigned believes that doing business in, or trading at, a United States port is not the same thing as establishing a base of operations in the United States as set forth in *Rhoditis.* As a leading commentator observed:

> Rhoditis (like Lauritzen) suffers from the customary weakness of any judicial decision. Just as Lauritzen, on its facts, had been almost the weakest possible case for the application of American Law on any theory, so Rhoditis was the strongest possible case for its application on what may be called the 'base of operations' theory ... While a flat overruling of Rhoditis appears to be unlikely, *extension of the base of operations doctrine to enterprises less clearly linked to the United States appears to be unlikely.*

G. Gilmore and C. Black, *The Law of Admiralty* 475 (2nd ed. 1975), cited in *De Mateos v. Texaco, Inc.,* 562 F.2d 895, 901–902 (3rd Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978) (emphasis added).

Most cases that supports the base of operations and other similar theories beyond those set forth in *Lauritzen* involve similar facts, that is; (1) the corporations principle place of business is in the United States, (2) the managing or charactering agents are located in the United States, (3) most of the income is derived from cargo either terminating or originating in the United States, (4) expenses of the vessel are paid in the United States, and (5) the actual management of the corporation is from a United States office. *See: De Mateos v. Texaco, Inc., supra; Antypas v. Cia Maritima San Basilio, S. A.,* 541 F.2d 307 (2nd Cir. 1976); *Mattes v. National Hellenic Am. Lines, S. A.,* 427 F.Supp. 619 (S.D.N.Y.1977). If these elements are not met the court will dismiss for lack of subject matter jurisdiction.

In *De Mateos v. Texaco, Inc., supra* at 899, jurisdiction was held inapplicable even though United States ownership was involved and the vessels owned by the corporation *"regularly called"* at United States ports (emphasis added).

On the other hand, in *Antypas v. Cia Maritima San Basilio, S. A., supra* at 310, jurisdictional requirements were met since it was found that (1) some of the stockholders of Defendant shipowner were United States citizens, (2) the vessel was operated by a New York agent, who directly controlled the operations of the vessels, and (3) all earnings were collected and all expenses paid in New York.

In *Mattes v. National Hellenic Am. Line, S. A., supra,* the Plaintiff also alleged that the vessel had made many visits to the United States (26 in all) and that *most* of the voyages either originated or terminated in the United States. However, either originated or terminated in the United States. However, jurisdiction was not granted on

this factor *alone*. The management and operation of the vessel was centered in New York and at least two American corporations played a significant role in the management of the vessel's affairs.

The base of operations factor is inapplicable here. The principles of *Lauritzen* are still fundamental and most important in determining whether contacts are substantial. *See De Mateos v. Texaco, Inc., supra* at 901. The law of the flag, the allegiance of the Defendant shipowner, the place of contract, the accessibility of a foreign forum, and the base of operations of the corporation all point away from the application of American law. If we are to justify its application, it must be because, as Justice Douglas suggested in *Rhoditis*, "there well may be other significant factors." The only one referred to is the percentage of the companies operations in the United States and the number of trips that the vessel has made to American ports. In light of the foregoing, these are not substantial enough to find jurisdiction in this case.

Plaintiff has filed an original set of interrogatories with 59 principal questions and over 140 subquestions, a total of 109 interrogatories, which Defendant has answered. Plaintiff filed an additional second set of interrogatories, consisting of 24 questions with 6 subparts, a total of 30 interrogatories, which, as Defendant has alleged, required voluminous research and great expense to answer. Defendant answered these interrogatories on August 21, 1978. Defendant served interrogatories on the Plaintiff on June 16, 1978, but said interrogatories remain *unanswered* by Plaintiff. Defendant has stated that Plaintiff has made no request to depose any witness within or without the control of the Defendant. Now, Plaintiff apparently wants more delay to conduct more discovery. Because of the extensive discovery already conducted by Plaintiff since July of 1977, when the complaint was filed, the Magistrate concludes that further discovery is not necessary for a just and proper disposition of the case.

Accordingly, it is RECOMMENDED that Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction be Granted.

The Clerk will file this instrument and transmit a copy to each party or counsel. Within ten days after receipt of the copy, a party may file with the Clerk, and serve on all parties, written objections, pursuant to Local Rule 24 and 28 U.S.C. § 636(b)(1)(C).

Done at Houston, Texas, this 6th day of April, 1979.