**Enrique WILLIAMS, Plaintiff,**

v.

**CRUISE SHIPS CATERING and Service International, N.V.; Prestige Cruises N.V.; and Costa Crocker, SPA Defendants**

No. 03–60158–CIV.

United States District Court, S.D. Florida.

Dec. 3, 2003.

Charles R. Lipcon, Lipcon Margulies & Alsina, David H. Pollack, Miami, FL, for Plaintiff.

Richard James McAlpin, McAlpin & Brais, Miami, FL, for Defendants.

*ORDER DENYING DEFENDANT'S MOTION TO DISMISS ON FORUM NON CONVENIENS GROUNDS*

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss on *Forum Non Conveniens* Grounds [DE # 63, July 23, 2003]. Plaintiff filed his Opposition on August 22, 2003 [DE # 73], and Defendants filed their Reply [DE # 91] on October 7, 2003. The Court held oral argument regarding the Motion on November 14, 2003. Upon review of the record, the parties' arguments, and applicable statutory and case law, the Defendants' Motion to Dismiss on *Forum Non Conveniens* Grounds is **DENIED**.

### Jurisdiction

The Court's jurisdiction is invoked pursuant to the Jones Act, 46 App. U.S.C.A. § 688, and the general maritime law of the United States. Complaint ¶ 4 [DE # 1, February 3, 2003]

### Factual Background [1]

### I. Allegations

Plaintiff, a Costa Rican citizen, brought this action against Cruise Ships Catering and Service International, N.V. ("CSCS International"), Prestige Cruises, N.V. ("Prestige"), and Costa Crociere, S.p.A. ("Costa Crociere" or "Costa") for injuries he suffered on two separate occasions in October and November 2000 while he worked aboard the M/S Costa Atlantica ("Atlantica"), an Italian-flagged vessel. Plaintiff alleges claims under the Jones Act and claims for unseaworthiness, failure to cure, and failure to treat. *Id.* Plaintiff also seeks to garnish funds from Costa

---

**1.** These facts derive from the allegations contained in the Complaint and from the exhibits in evidence.

Cruise Lines, N.V. ("Costa Cruise Lines"), a Florida company. *Id.*

## II. The Defendants

The M/S Costa Atlantica's owner is Costa Crociere, an Italian company that is at least 99% owned by Carnival Corporation ("Carnival"). [Costa Crociere Affidavit ¶ 7] Carnival is a Panamanian company with its principal place of business in Florida. [Costa Crociere Affidavit ¶ 7; 10–K filing with the Securities and Exchange Commission ("SEC") for fiscal year ending November 30, 2002 (listing a Miami, Florida address as Carnival's principle executive offices); Carnival's 10–Q filing for the quarterly period ending May 31 2003 (listing a Miami, Florida address as Carnival's principle executive offices) ].[2]

Carnival's 10–K filing for the fiscal year ending November 30, 2002 describes the corporation as a "global cruise vacation and leisure travel provider that operates six cruise lines under brand names" including Costa Cruises. *Id.* at Notes to Consolidated Financial Statements, Note Carnival states in its SEC filing that it "consolidate[s] subsidiaries over which [it has] control, as typically evidenced by a direct ownership interest of greater than 50%." [*Id.* at Note 2]. Further, "a direct ownership interest from 20% to 50%" typically evidences a "significant influence over financial and operating policies." [*Id.*].

Carnival is listed on the New York Stock Exchange. [Carnival's Notice of Annual Meetings at 34, May 12, 2003]. Shareholders wishing to obtain copies of Carnival's SEC filings in May 2003 were instructed to send a written request to Carnival Corporation in Miami, Florida. [*Id.* at 13]. Carnival's 2002 Stock Plan, effective January 14, 2002, provided that the Plan be governed by and construed in accordance with Florida law. [*Id.* at 12]. As of May 12, 2003, Florida residents [3] Micky Arison and other members of his family and trusts for their benefits beneficially owned shares representing approximately 44% of the voting power of Carnival Corporation and had approximately 33% of the combined voting power. [*Id.* at 20]. Micky Arison has been Chief Executive Officer ("CEO") since 1979, Chairman of the board of directors of Carnival since October 1990, and a director since June 1987. [*Id.* at 22]. Arison is also the Chairman, CEO, and indirect sole shareholder of Florida Basketball Associates, Inc., which entered into transactions with Carnival during fiscal year 2002. [*Id.* at 50].[4]

Costa Crociere is the principle shareholder of the remaining Defendants. [Costa Crociere Affidavit ¶¶ 9–24]. Defen-

---

**2.** At the November 14, 2003 hearing, the Court requested a copy of Carnival's SEC filings and financial statements, some of which were referenced in the record but were not submitted in their entirety. Plaintiff delivered a copy of these document to the Court on November 25, 2003 but did not actually file them. On the same day, Plaintiff also delivered Carnival's Notices of Annual Meetings and Carnival's 10–Q filing for quarterly period ending May 31, 2003. The Court will issue a separate Order directing the Clerk of Court to file these documents with the Court.

**3.** At the November 14, 2003 hearing, the Court directed the parties to state the undis-

puted facts in the record. The parties did not dispute that the Arisons reside in Florida. Oral Argument regarding Motion to Dismiss at 00:04:33 a.m.–00:04:44 a.m.

**4.** Although some of these facts are derived from portions of the record dated after the accidents forming the basis of this action took place, the parties agreed that many of these facts are undisputed. Oral Argument regarding *Motion to Dismiss* at 00:04:05–00:06:26. Further, the Court wishes to provide a complete picture of Defendants' contacts with the forum.

dant Prestige Cruises, N.V., a Netherlands Antilles company, acted as the bareboat charterer of the vessel at certain times.[5] [*Id.* at ¶ 11] Defendant CSCS International, also a Netherlands Antilles corporation, was Plaintiff's employer. [Compliant ¶ 6]. Finally, Costa Cruise Lines, another subsidiary of the Costa group, is the sales and marketing agent for Costa Crociere's vessels that call in the United States. [Plaintiff's Exh. 2 at 6; Plaintiff's Exh. 3 at 25; Plaintiff's Exh. 4]. Costa Cruise Lines is organized under the laws of the Netherlands Antilles and does business in the United States. [Costa Crociere Affidavit ¶ 22(h) ]. Costa Cruise Lines sells approximately 33,000 tickets annually to United States passengers. [Plaintiff's Exh. 2 at 6]. Its revenue from ticket sales to United States passengers last year totaled 28 million dollars. [Plaintiff's Exh 2 at 21]. Costa Crociere spent approximately five to six million dollars marketing its ships in North America. [Plaintiff's Exh. 2 at 21].

### III. The Accidents

Plaintiff's claims arise from two accidents which occurred in the fall of 2000. On October 13, 2000, Plaintiff was transporting a trolley full of wet towels to the laundry while the Atlantica was on the high seas in international waters. [Complaint ¶ 9, 11]. Plaintiff injured his back while lifting the trolley over a metal latch at the bottom of a door. [*Id.*] The second accident occurred in early November 2000. While Plaintiff was standing in front of an elevator, the elevator door opened, and luggage which had been piled in the elevator fell out and struck Plaintiff's left leg and left knee. [*Id.* at ¶ 16, 18].

### IV. Fort Lauderdale Ports of Call

During the time of the accidents, Costa Crociere operated the Atlantica, along with other ships, in the Carribean market, stopping in Fort Lauderdale and Key West, Florida [Costa Crociere Affidavit ¶ 6]. The vessels made these trips on a regular basis over a four month period during 2000. [*Id.*] Plaintiff received treatment for his injuries from Dr. Jeffrey Rich, who is located in Miami, Florida, during one of Atlantica's regular stops in Fort Lauderdale. [Klutz Affidavit ¶ 20].

### V. Maintenance and Cure Benefits

Through its wholly-owned subsidiary, Costa's decisions regarding payment of maintenance and cure benefits were made in Florida, either under the auspices of CSCS Caribbean, N.V. or through its authorized agent, International Risk Services, Inc. (IRSI). [Maintenance and Cure letters attached to Complaint]. IRSI administers medical benefits for CSCS International's employees and handles third party claims made against the company. [Plaintiff's Exh. 6 at 38].

CSCS Caribbean, N.V., a corporation authorized to do business in Florida, acted as the staffing or crewing agent for the personnel employed on board the ships owned or operated by Costa Crociere. [Plaintiff's Exh. 3 at 27]. CSCS Caribbean ceased doing business in Florida in 1999, but it was not put into liquidation until May 31, 2001, and it sent a letter to Plaintiff paying him benefits on January 9, 2001. [*Id.;* Plaintiff's Exh. B. at 12; Maintenance and cure checks attached to Complaint]. Further, benefits checks were being issued out of Florida on the CSCS International account as late as Jan-

---

**5.** In their Motion to Dismiss, Defendants state that Prestige is an improperly named Defendant because it was not the bareboat charterer of the vessel at times relevant to this action. Prestige, however, has not filed a motion to remove itself from this case.

uary 2003. [Plaintiff's Exh. 4 at 56, 58; Plaintiff's Exh. 5 at 10].

## Legal Standard

■ Under Eleventh Circuit case law, the application of the Jones Act involves a question of choice of law, the determination of which requires a two-pronged inquiry. *Szumlicz v. Norwegian America Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir. 1983). First, the district court must decide, under choice of law principles, whether the law of the United States should be applied. If United States law applies, the case should not be dismissed for *forum non conveniens. Id.* If the court determines that United States law does not apply, it shall then examine the traditional considerations of *forum non conveniens* to determine whether the court should exercise its discretion and decline to assert jurisdiction over the case. *Id.*

## Jones Act Factors

Before conducting the forum non conveniens analysis as suggested by Defendants, this Court is obligated to determine whether the Jones Act is applicable under the facts of the case. *Szumlicz v. Norwegian America Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir.1983). The Jones Act provides the following:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury … Jurisdiction in such actions shall be under the court of the district in which the defendant employer

resides or in which his principal office is located.

46 U.S.C.app. § 688(a).

■ In *Lauritzen v. Larsen*, 345 U.S. 571, 583–91, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the United States Supreme Court outlined the following seven factors for determining whether the Jones Act is applicable to a claim: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the shipowner; (5) the place where the shipping articles were signed; (6) the accessibility of the foreign forum; and (7) the law of the forum. The Supreme Court subsequently emphasized that the *Lauritzen* factors were neither exhaustive nor meant to be applied mechanically to the facts of each case. *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308–09, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970).[6] The Court then noted the importance of an eighth factor, the "shipowner's base of operations." *Id.* at 309, 90 S.Ct. 1731. Although the *Rhoditis* Court referred to the "shipowner's" base of operations, the Court later noted that the operational contacts of both the ship and its owner were to be considered in the choice of law analysis. *Id.* at 310, 90 S.Ct. 1731. Otherwise, an alien owner with substantial business operations in the United States might escape his obligations as a Jones Act "employer" and unfairly disadvantage citizens of this country engaged in the same business. 398 U.S. at 309, 90 S.Ct. 1731. The Court in *Rhoditis* held that the Defendant's "base of operations" was in the United States because: (1) the owner, who held ninety-five percent of the

---

6. *Rhoditis* was brought under the Jones Act by a Greek seaman injured on board a Greek ship docked at the port of New Orleans. The vessel was owned by a Greek corporation, whose owner was a Greek citizen, residing in the United States. The ship sailed under a Greek flag, and the injured seaman's contract, which was signed in Greece, provided that Greek law applied to disputes between the seaman and the employer. The contract provided that any such disputes are to be adjudicated in a Greek court. *Rhoditis*, 398 U.S. at 308, 90 S.Ct. 1731.

stock, was a U.S. domiciliary; and (2) the ship was not a "casual visitor" to New York, but rather earned "income from cargo originating or terminating here." *Rhoditis*, 398 U.S. at 310, 90 S.Ct. 1731. As the *Rhoditis* court explained:

> The flag, the nationality of the seaman, the fact that his employment contract was Greek, and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country... [T]he facade of the operation must be considered minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States.

*Id.*

■ Relying on *Rhoditis*, the Eleventh Circuit held in *Szumlicz* that the substantial use of a United States "base of operations" by the vessel's owner, along with any other U.S. contacts, justified the application of the Jones Act, and, thus, precluded dismissal on the basis of forum non conveniens 698 F.2d at 1195. As in *Rhoditis*, the *Szumlicz* court reached this conclusion even though almost all of the other *Lauritzen* factors favored the defendant. *Szumlicz*, 698 F.2d at 1196. In *Szumlicz*,

the nationality of the flag was Norwegian, the "place of the contract" was Norway and Germany, the "forum" and "law of the forum" were Norwegian, and the "place of the wrongful act" was in international waters *Id.* Thus, the Eleventh Circuit has placed significant weight on the *Rhoditis* base of operations factor, where, despite the facade of foreign management, the ship and the shipowner have close operational contacts with the United States. The Eleventh Circuit upheld the district court's conclusion "that sufficient contacts were adduced to justify retaining jurisdiction over the cause and to make the application of American Law appropriate under the circumstances of this case." *Id.*; 698 F.2d at 1194–95 This conclusion was based upon a "finding that the defendants conducted substantial business in United States ports and that plaintiff was treated for his medical condition in the United States while serving aboard defendant's vessel and in their employment." *Id.*[7]

### Analysis

■ Applying the above well-established principles to the case at hand, the Court DENIES the Motion to Dismiss This decision rests largely upon the eighth choice of law factor under the Jones Act, the base of operations factor.

---

**7.** In *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512 (11th Cir.1985), without discussing or acknowledging its earlier decision in *Szumlicz*, the court determined that the Jones Act did not apply because the case was "very different" from *Rhoditis, Id.* at 1518.

When two Eleventh Circuit opinions conflict, and there is no intervening Supreme Court decision, the earlier opinion governs. *See, e.g., Leonard v. Enterprise Rent A Car*, 279 F.3d 967 (11th Cir.2002) ("Where an intra-circuit conflict of law exists, the earliest panel opinion is controlling.") (citation omitted). Thus, to the extent that *Sigalas* conflicts with *Szumlicz*, the Court must follow the *Szumlicz*

decision. The Court's opinion today, however, does not conflict with either case. Significantly, in *Sigalas*, 80% of the stock of the relevant corporations was held by Greeks, who exercised complete control of the vessel. 776 F.2d at 1514. Here, as later discussed, 99% of the stock is held by an American corporation who, through its subsidiaries and agents, exercised in the United States significant control over maintenance and care of crew members, and earned substantial revenues from business operations relating to the vessel in the United States at all times material to this case.

**The *Lauritzen* Factors**

Similar to the circumstances in *Rhoditis* and *Szumlicz*, several of the seven *Lauritzen* factors weigh in Defendants' favor. Of the seven factors, the first three support Defendants' position: (1) the place of the wrongful act is not the United States but the high seas; (2) the law of the ship's flag is Italian; and (3) Plaintiff is domiciled in Costa Rica [*See* Complaint].

Defendants argue that the fourth factor, the allegiance of the shipowner, weighs in their favor as well because Costa Crociere's headquarters are in Italy. [Costa Crociere Affidavit ¶ 3] Plaintiff, however, disputes this statement and argues that core functions such as passenger and ticket sales and marketing take place in the United States [Plaintiff's Exh. 2 at 6, 21]. The Plaintiff's arguments here are similar to those he makes when discussing the base of operations, and the Court will address these arguments when discussing that factor.

Regarding the fifth factor, the place where the shipping articles were signed, the employment contract does not indicate where it was signed, but this fact is not material Although it considered this factor, the *Lauritzen* Court explained that the "place of contracting in this [maritime action], as is usual to such contracts, was fortuitous" because "a ship takes on crew at any port where it needs them." 97 L.Ed. at 1271 Further, the Court stated, "[w]e do not think the place of contract is a substantial influence in the choice between competing laws to govern a maritime tort." *Id.*

Regarding the sixth factor, the accessibility of the foreign forum, Defendants argue that Italy, Costa Rica, or the Netherlands Antilles are available alternate fora, yet Plaintiff once again echoes its base of operations argument by stating that the case has little or no connection with Italy or the Netherlands Antilles other than several of Costa Crociere's phantom shell companies, which are nominally located there. [Plaintiff's Exh. B].

Concerning the seventh factor, the law of the forum, Defendant argues that United States law should not be imposed just because a United States court may have jurisdiction over the parties. Plaintiff essentially argues that Defendants' operations are based here, and thus there is a significant connection to the United States, warranting the application of United States law. Again, the Court concludes that Plaintiff's base of operations argument has merit sufficient to overcome the other factors.

## VI. United States Base of Operations

██ Even though several of the *Lauritzen* factors weigh in Defendants' favor, the eighth *Rhoditis* factor is most compelling and determinative here This factor requires the Court to determine whether the defendant's base of operations is in the United States. As noted in *Rhoditis,* it is necessary to look beyond corporate formalities to examine both the ship's and shipowner's operational contacts with the United States. 398 U.S. at 310, 90 S.Ct. 1731. The Court concludes that both the ship's and shipowner's operational ties are significant based upon substantial contacts with the United States.

Courts have examined various factors in determining whether or not there is sufficient evidence to support Jones Act jurisdiction based upon a defendant's base of operations in the United States. In *Fantome, S.A. v. Frederick,* 2003 WL 23009844 (11th Cir.2003) (unpublished), the Court concluded on contacts less substantial than the ones present in this case that the district court's dismissal based on *forum*

*non conveniens* should be reversed.[8] In *Fantome*, the vessel involved never entered a United States port. *Id.* at *3. The Eleventh Circuit stated that the fact that the daily operations of the vessel took place in the Carribean "do[es] not prevent a finding that the corporate base of operations was the Miami Beach headquarters." *Id.* at *10, *citing Neely v. Club Med Mgmt. Servs., Inc.,* 63 F.3d 166, 194 (3d. Cir. 1995) (en banc) ("Moreover, because we are inquiring into the substantiality of contacts with the United States, we consider both the base of daily operations of the vessel. and the corporate bases of the defendants."). In *Fantome*, all of the vessel's day-to-day operations and repairs took place outside the United States. *Id.* The Court nevertheless reversed the dismissal because the vessel's operating agent was headquartered in Miami, the company handling the vessel's advertising, reservations, and sales also operated out of and was located in Miami, Florida, and the company's principal shareholder and operating agent resided in Miami Beach. *Id.* at *2–3.

Other courts have also concluded that the base of operations factor alone is sufficient to deny dismissal based on *forum non conveniens* grounds. *See Mattes v. Nat'l. Hellenic American Line, S.A.,* 427 F.Supp. 619 (S.D.N.Y.1977). In that case, the plaintiff seamen was a Greek citizen hired in Greece under Greek articles of employment as a crewmember of a Greek-flagged vessel *Id.* The court determined that these facts were minor when "compared with the substantial and continuing contacts that [the defendant] has with this country." *Id.* at 623 (citation omitted). The court cited to other cases, one in which the sole fact that the shipowning corporation was wholly owned by American stockholders was a sufficient contact for Jones Act jurisdiction. *Id., citing Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470 (2d Cir.1974), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974): *see also Antypas v. Cia. Maritima San Basilio, S.A.,* 541 F.2d 307, 310 (2d cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977) (noting that American citizenship of at least some of the stockholders of the shipowner has been held sufficient in and of itself to support jurisdiction under the Jones Act) (citation omitted).

In *Mattes*, the court concluded that substantial aspects of the defendant corporation's operation, management, and marketing were directed by American corporations; these corporations, though nominally separate and distinct corporate entities, all sought to derive advertising benefits in the United States through the use of a general corporate identifying name; and the defendants participated in a coordinated effort to conduct a passenger shipping business in the United States. *Mattes,* 427 F.Supp. at 626. Collectively, these facts led the court to conclude that the defendant's contacts with the United States were sufficient to exercise Jones Act jurisdiction. *Id.* The absence of American stock ownership did not deter the court from its decision *Id.*

Courts considering the base of operations factor have found the following contacts persuasive in determining that a United States base of operations was present: sales and marketing activity in the United States and stock ownership by an American corporation and residents.

**8.** The Eleventh Circuit provides by rule that unpublished opinions are not binding precedent, but they may be cited as persuasive authority, provided that a copy of the unpublished opinion is attached to or incorporated within the brief, petition, or motion. Eleventh Circuit Rules, Rule 36–2, 28 U.S.C.A.

These contacts are present in this case. Further, unlike the vessel in *Fantome,* the Atlantica has U.S. ports of call. Finally, decisions regarding maintenance and cure were made in the United States. The facts of this case therefore suggest substantial contacts with the United States based on the Defendants' base of operations.

### 1 *United States Sales, Marketing, and Ownership*

It is undisputed that members of the Costa group sought to derive advertising and marketing benefits in this country through the use of the general identifying corporate name of "Costa." It is also undisputed that Costa Cruise Lines, another Costa subsidiary, participated in a coordinated effort to conduct a passenger cruise business in the United States. [Plaintiff's Exh. 2 at 6, 21; Carnival's 10–K filing at Notes to Consolidated Financial Statements, Note 1] Furthermore, Costa has been financially successful through its advertising and marketing efforts in the United States; Costa Cruise Lines handles all of the passenger tickets sales for Costa Crociere's vessels that call in the United States. [*Id.*] Costa Cruise Lines collects the revenues from these tickets in Miami, Florida and then forwards them to Costa Crociere in Italy. [*Id.;* Oral Argument regarding Motion to Dismiss at 00:10:37– 00:10:41]. According to record evidence, Costa Cruise Lines, N.V. sells approximately 33,000 tickets annually to United States passengers. It also handles all of the sales, marketing, and advertising for Costa Crociere's ships in the United States. Costa Cruise Lines, N.V.'s revenue from its ticket sales to United States passengers last year totaled $28 million dollars. *Id.* In addition, Costa Crociere spent approximately $5 to 6 million dollars on marketing its ships in North America. *Id.* In so doing, Costa has put itself in direct competition with American companies for American passengers in the competitive Carribean cruise market.

Defendants argue that these numbers comprise a small amount of Costa's business when compared to the business it conducts in other countries. They state that although 33,000 passengers on Costa cruise ships come from the United States, 93% of the passengers aboard the vessels in the Costa fleet are from countries outside the United States. [Plaintiff's Exh. 2 at 29–36]. They also state that 96.5% of the Costa fleet's cruise revenues come from other countries. [*Id.* at 35]. Further, Costa Cruise Lines is one the eight sales and marketing companies for Costa Crociere, and it is the only one of these companies located in the United States. [Costa Crociere Affidavit ¶ 22].

In recent Southern District of Florida orders dismissing actions against the same Defendants as in this case for *forum non conveniens,* Judge William P. Dimitrouleas concluded that Defendants' arguments had merit. *See Rodriguez v. Cruise Ships Catering and Serv. Int'l., N.V., et. al.,* No. 03–60158 (S.D.Fla. November 18, 2003) (final judgment and order granting motion to dismiss) and *Bautista v. Cruise Ships Catering and Serv. Int'l., N.V., et. al.* No. 03–60160 (S.D.Fla. November 18, 2003) (final judgment and order granting motion to dismiss). Judge Dimitrouleas began with the premise that a substantial relation was necessary to justify the application of United States law in order to determine that the base of operations factor weighed in the plaintiff's favor. *Rodriguez,* No. 03–601158 at 3, *citing Sigalas,* 776 F.2d at 1518, *citing Bailey v. Dolphin Int'l., Inc.,* 697 F.2d 1268, 1276 (5th Cir.1983), *overruled on other grounds by In re Air Crash Disaster Near New Orleans,* 821 F.2d 1147

(5th Cir.La.1987)[9]; *Bautista*, No. 03–60160 at 3, *citing Sigalas*, 776 F.2d at 1518, *citing Bailey v. Dolphin Int'l., Inc.*, 697 F.2d 1268, 1276 (5th Cir.1983), *overruled on other grounds by In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147 (5th Cir.La.1987) Judge Dimitrouleas' orders stated that the "mere fact that the bulk of a company's profits comes from U.S. pockets is insufficient alone to warrant the application of U.S. law." *Rodriguez*, No. 03–601158 at 3, *citing Sigalas*, 776 F.2d at 1518; *Bautista*, No. 03–60160 at 3, *citing Sigalas*, 776 F.2d at 1518. Judge Dimitrouleas distinguished *Fantome* by explaining that every decision not made on the actual vessel in that case was made in Miami Beach. *Rodriguez*, No. 03–601158 at 3, *citing Fantome*; *Bautista*, No. 03–60160 at 3, *citing Fantome*. Judge Dimitrouleas contrasted this fact with the facts before him, namely, that the vast majority of Costa's passengers and marketing come from other countries *Rodriguez*, No. 03–601158 at 3, *citing Gutierrez v. Diana Investments Corp.*, 946 F.2d 455, 457 (6th Cir.1991) (ruling that 20% of a company's business deriving from the United States was insufficient to warrant United States jurisdiction in that case); *Bautista*, No. 03–60160 at 3, *citing Gutierrez v. Diana Investments Corp.*, 946 F.2d 455, 457 (6th Cir.1991) (ruling that 20% of a company's business deriving from the United States was insufficient in that case to warrant United States jurisdiction). Judge Dimitrouleas concluded, based on *Sigalas* but acknowledging that *Szumlicz* conflicts with this proposition, that the base of operations factor was insufficient to warrant the application of U.S. law *Rodriguez*, No. 03–601158 at 3, *citing Sigalas*, 776 F.2d at 1518; *but see Szumlicz*, 698 F.2d 1192; *Bautista*, No. 03–60160 at 3; *citing Sigalas*, 776 F.2d at 1518; *but see Szumlicz*, 698 F.2d 1192.

The Court respectfully acknowledges Judge Dimitrouleas' orders in these cases but disagrees with the ultimate determination of the issue First, as explained in footnote 7 *supra*, the Court must follow the earlier Eleventh Circuit opinion in *Szumlicz* in the event that it conflicts with *Sigalas*. In this case, however, there is no need to reach this issue. In *Sigalas*, 80% of the stock of the relevant corporations was held by Greek nationals and domiciliaries, as opposed to 99% ownership here. *See Sigalas*, 776 F.2d at 1514. *Sigalas* distinguishes *Rhoditis* partly based on this very fact—namely, that 95% of the stock of the corporation involved was held by a Greek citizen who had been an American domiciliary for twenty five years. *Id.* at 1518. Second, the Sixth Circuit case Judge Dimitrouleas cites for the proposition that 20% of a company's business being conducted in the United States is insufficient to exercise jurisdiction actually states, "We can conceive, however, of a situation in which 20 percent of a shipowner's business being conducted through a United States port in *combination with other factors*, such as were present in *Rhoditis*, might make for a much closer case on the jurisdictional issue." *See Gutierrez*, 946 F.2d at 457 n. 4 (emphasis in the original). One fact the court highlights in distinguishing *Rhoditis* is the 95% ownership of the relevant corporation by an American domiciliary. *Id.* at 456. The court also explained, "[W]e do not purport to reduce this [substantial contacts] test to a percentage formula." *Id.*

**9.** This Fifth Circuit case was decided after *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), which held that all Fifth Circuit decisions prior to October 1, 1981 are binding precedent on the Eleventh Circuit. *Id.* at 1209. Thus, Bailey is not binding precedent on this Court.

■ The Court agrees that percentages and relative comparisons of United States versus non-United States business are not primary factors in deciding the base of operations factor. Rather, the important question is whether the contacts, irrespective of the defendant's contacts in other countries, amount to a *substantial* relation to the United States. *See Sigalas,* 776 F.2d at 1518. The Court concludes that in this case, the contacts amount to a substantial relation. In particular, the Costa corporations, though nominally separate and distinct corporate entities, all function as interrelated parts of a worldwide "Costa" corporate group. The key link to the United States is that Carnival, a Florida corporation, with its principal place of business in Miami, is the principal shareholder (99%) of the parent company, Costa Crociere, who, in turn, is the principal shareholder of the remaining defendants.[10] [Costa Crociere Affidavit ¶¶ 7, 9–24; Carnival's 10–K filing for fiscal year ending November 30, 2002 (listing a Miami, Florida address as Carnival's principle executive offices); Carnival's 10–Q filing for the quarterly period ending May 31, 2003 (listing a Miami, Florida address as Carnival's principle executive offices)].

Carnival's SEC filings state that a 50% ownership interest typically evidences a "significant influence over financial and operating policies." [10–K filing, Notes to at Consolidation Financial Statements, Note

1]. Carnival is a New York Stock Exchange Corporation with its headquarters in Miami, Florida. [Carnival's Notice of Annual Meetings at 34, May 12, 2003; Costa Crociere Affidavit ¶ 7; 10–K filing with the Securities and Exchange Commission ("SEC") for fiscal year ending November 30, 2002 (listing a Miami Florida address as Carnival's principle executive offices);[11] Carnival's 10–Q filing for the quarterly period ending May 31, 2003 (listing a Miami, Florida address as Carnival's principle executive offices)].

It is undisputed that Carnival's principal shareholders are the Arisons, who live in Miami and conduct other business here. [Oral Argument at 00:04:33–00:04:44]. Micky Arison has been Chief Executive Officer ("CEO") since 1979, Chairman of the board of directors of Carnival since October 1990, and a director since June 1987. [Carnival's Notice of Annual Meetings at 22] Arison is also the Chairman, CEO, and indirect sole shareholder of Florida Basketball Associates, Inc., which entered into transactions with Carnival during fiscal year 2002. [*Id.* at 50]. These facts indicate that Carnival, the direct owner of Costa Crociere, has a significant influence over Costa's financial and operating policies and conducts its daily business operations in Miami, Florida. Through Carnival, the Costa corporations are substantially related to the United

---

**10.** The 99% ownership distinguishes this case from *Sarkissian v. Carnival Corp.,* No. 99–446 (S.D. Fla. filed September 27, 2000) (order granting summary judgment). At times material to that case, Carnival had at most a fifty percent equity ownership of Costa through its subsidiaries. *Id.* at 11. Further, the legal issue in that opinion was not dismissal based on *forum non conveniens* but was whether the plaintiff had properly named Carnival as the defendant in the action instead of Costa Crociere, the actual owner of the cruise ship involved in the accident leading to the claims in the case.

**11.** Plaintiff delivered a copy of this document to the Court on November 25, 2003, but did not actually file it. On the same day, Plaintiff also delivered Carnival's Notices of Annual Meetings and Carnival's 10–Q filing for quarterly period ending May 31, 2003. At the November 14, 2003 hearing, the Court requested a copy of these documents, some of which were referred to in the record but not submitted in their entirety.

States.[12]

## 2. *United States Ports of Call*

In addition to contacts the *Fantome* court and other courts have found relevant, additional contacts are present in this case. During the period in question (October and November 2000), Costa operated the M/V Costa Atlantica, along with other ships, in the Carribean market, stopping in Ft. Lauderdale and Key West, Florida. [Costa Crociere Affidavit ¶ 6]. Costa operated other ships that did so as well. [*Id.*]. The record establishes that the Atlantica made these trips on a regular basis during a four month period during the year 2000. [*Id.*]. During one of its stops, the Plaintiff was treated by a doctor in Ft. Lauderdale for the injuries in question. [Klutz Affidavit ¶ 20]. This contact distinguishes this case from *Baydar v. Renaissance Cruises, Inc.*, 35 F.Supp.2d 916 (S.D.Fla.1999), in which the Court granted dismissal on *forum non conveniens* grounds. In *Baydar*, this Court determined that the eighth factor did not warrant Jones Act jurisdiction partly because there were no United States ports involved. Also, in *Baydar*, the stock ownership of the defendants was not persuasive, while it is an important contact leading to jurisdiction in this case. *See id.* These factors combine to suggest a substantial relationship with the United States.

## 3. *Maintenance and Cure*

In addition to marketing and sales, an essential Costa function involving crew members took place in Florida at the time of the incident. Through Costa's wholly-owned subsidiary, decisions regarding payment of maintenance and cure benefits were made in Florida, either under the auspices of CSCS Caribbean or through its authorized agent, IRSI.[13] IRSI's president, Klutz, whose office in the United States is on the same floor as Costa Cruise Lines' offices, handles the day-to-day administration of the benefits CSCS International pays Costa employees. [Plaintiff's Exh. 4 at 54; Oral Argument regarding Motion to Dismiss at 00:29:15–00:30:07]. Checks representing medical maintenance were sent by Costa's agent, IRSI, directly from Hollywood, Florida, for the period of January 2001 through July 2002. [Maintenance and cure letters attached to Complaint]. IRSI processed the benefits on behalf of CSCS International, and the money came out of CSCS International/Caribbean bank accounts in the United States. [Oral Argument regarding Motion to Dismiss at 00:21:11–00:22:48]. Further, benefits checks were issued out of Florida on the

---

12. Other factors also lead the Court to a different result from the orders in *Rodriguez* and *Bautista*. In those cases, it did not appear from the record that the plaintiffs had visited the United States, unlike the present case, where Plaintiff received treatment in Florida. [Klutz Affidavit ¶ 20]. Further, the Court in *Rodriguez* and *Bautista* did not discuss Carnival's 99% ownership of Costa Crociere, and the orders did not discuss the issuance of the maintenance and cure checks in the United States. [*Id.*].

13. Defendants allege that IRSI is an independent contractor that simply subleases office space from Costa Cruise Lines. Plaintiff's Exh. 6 at 5–27. They also state that a Costa employee signed maintenance and cure checks for unlicensed crew members at times material to this case in amounts calculated by IRSI because there was no one else in United States left to perform this function after dissolution of CSCS Carribean NV. Plaintiff's Exh. 4 at 6–7, 11–12, 48. The record, however, shows that Klutz's office is located in Costa Cruise Lines' offices, about three doors away from Campagna's office. *Id.* at 54. Further, when Costa Cruise Lines moved from Southwest 8th Street to its current location, Klutz and IRSI moved with it. Plaintiff's Exh. 5 at 9. Also, at the November 14, 2003 hearing, the parties agreed that IRSI acted as an agent for the Costa group. Oral Argument regarding Motion to Dismiss at 00:20:25–00:20:38.

CSCS International account as late as January 2003. [Plaintiff's Exh. 4 at 56, 58; Plaintiff's Exh. 5 at 10]. While the Court has significant concerns over the credibility of the Klutz affidavit based upon Judge Friedman's order[14], there is no doubt that CSCS Caribbean, N.V., a Florida Corporation, with offices in Miami, was directly involved in payment of benefits to the Plaintiff by virtue of its letter of January 9, 2001

### 4. Conclusion

While several of the first seven *Lauritzen* factors weigh against the application of American law, the eighth *Rhoditis* factor significantly weighs in Plaintiff's favor. This conclusion is based upon the facts that Defendants conducted substantial business in United States ports generating revenues for the ship's owner, Plaintiff was treated for his medical condition in the United States while serving aboard Defendant's vessel and in their employment, and important decisions relating to the Plaintiff's care and maintenance were made by a Costa subsidiary in the United States. These circumstances establish the United States as a base of operation by the ship's owner during the relevant time period.[15] Defendant ship owner has a substantial base of operations in the United States. Accordingly, the Court concludes that the law of the United States shall be applied in this case. As such, the case should not be dismissed for *forum non conveniens*. *Szumlicz v. Norwegian America Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir.1983).

It is hereby ORDERED AND ADJUDGED that:

1. Defendants' Motion to Dismiss on *Forum Non Conveniens* Grounds [DE # 63. July 23, 2003] is DENIED.

---

**14.** Plaintiff's Exh. B. contains Judge Friedman's order, in which he concluded that the Costa Corporations and CSCS International were conducting fraud by attempting to establish the Netherlands Antilles as their principle and sole place of business, while actually conducting extensive operations in the United States. *Tananta v. Cruise Ships Catering and Servs. Int'l.*, No. 00–31676 CA 02 (11th Judicial Circuit in Florida June 24, 2003) (order on plaintiff's motion for consideration of evidence of fraud). Similarly, Plaintiff's Exh. 5 consists of a hearing involving Costa Crociere and CSCS International where the court determined that neither of these companies have an office in the Netherlands Antilles. *Abisambra v. Costa Crociere, et. al.*, No. 99–4923 CA 32 (11th Judicial Circuit of Florida June 17, 2002) (hearing).

**15.** These factors distinguish this case from the orders in *Bautista v. Cruise Ships Catering and Serv. Int'l., N.V., et. al.*, No. 03–60160 (S.D.Fla. November 18, 2003) (final judgment and order granting motion to dismiss) and *Rodriguez v. Cruise Ships Catering and Serv. Int'l., N.V., et. al.*, No. 03–60160 (S.D.Fla. November 18, 2003) (final judgment and order granting motion to dismiss). In those cases, it did not appear from the record that the plaintiffs had visited the United States, unlike the present case, where Plaintiff received treatment in Florida. *Id.* Further, the Court in those orders did not discuss Carnival's 99% ownership of Costa Crociere, and the orders did not discuss the issuance of the maintenance and cure checks in the United States. *Id.*